**In re DATA ACCESS SYSTEMS SECURITIES LITIGATION.**

Michael VITIELLO, Stanley Sherin, Pamela Martin, J.H. Levit, Giles Franklin, Irwin Kurlander, Peter Doniger, Alexandria A. Richardson, Steven Stone, Ernest Greenberg, Carmen Pecoraro, and Hjalmar S. Sundin, Raymond Fasteau, Erroll Stoltz, Marvin Nott, John Infante, Plaintiffs,

v.

Gerald R. CICCONI, Robert T. Coppoletta, Benedict H. Paratore, Howard B. Crystal, James T. Simpson, Philip Hartley, Thomas Coppoletta, John J. Wilk, Frank Lockwood, Paul Matzko, Robert B. Franklin, Michael J. Haggerty, Peter V. Diguilio, Anthony J. Simei, Mario Caponegro, Gerald Lavine, Douglas Kreiner, Clarence Reed, Michael Evangelista, John Gault, Russell Hettinger, Samay Industries, Inc., E–O Data Corp., Cambria Corp., J&J Properties, Gault Associates, Inc., Transnet Corp., D&R Contractors, Johnson-Ferne Corp., Mark Serv Co., Touche Ross & Co., and D.H. Wallach, Inc. Data Access Systems, Inc., Defendants.

No. 81–1923.

United States District Court, D. New Jersey.

Sept. 20, 1984.

Philip Stephen Fuoco, Haddonfield, and Leonard Barrack, Gerald J. Rodos, John G.

Narkin, Barrack, Rodos & Bacine, Philadelphia, for plaintiffs.

William T. Cahill, Jr., Cahill, Wilinski & Cahill, Haddonfield, and Leon P. Gold, Arthur D. Felsenfeld, Jonathan D. Kantor, Shea & Gould, New York City, for defendant Touche Ross & Co.

Ira R. Deiches, Freeman, Gerstein, Mintz, Hagner & Deiches, P.A., Haddonfield, and Stuart H. Savett, Robert J. LaRocca, Kohn, Savett, Marion & Graf, P.C., Philadelphia, for defendant D.H. Wallach, Inc.

Patrick T. Ryan, Drinker Biddle & Reath, Philadelphia, for defendant Paul Matzko.

Howard D. Scher, Montgomery, McCracken, Walker & Rhoads, Philadelphia, for defendant Gerald R. Cicconi.

James A. Young, Saputelli, Nelson & Young, Haddonfield, and Stewart M. Duff, Jeffrey S. Adler, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, for defendants E–O Data Corp., James T. Simpson, Mario Caponegro, Russell Hettinger, Gerald Lavine, Samay Industries, Inc., and Anthony J. Simei.

## OPINION

BROTMAN, District Judge.

This action is brought by purchasers of securities against various defendants alleging that the financial statements of Data Access Systems, Inc., and its registration statement and prospectus contained material misrepresentations and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 of the Securities and Exchange Commission ("SEC"), Section 11 of the Securities Act of 1933, Section 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and applicable state and common law. This court's jurisdiction is based on 15 U.S.C. §§ 77v, 78aa and 18 U.S.C. §§ 1964 and 1965. Presently before the court is plaintiffs' motion for certification of a class and subclass of plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure. For the reasons which follow,

the court will certify the class and subclass, but with the class and subclass periods' termination dates different from those requested by the plaintiffs.

## I. Factual Background

Data Access Systems, Inc. ("DASI") a New Jersey corporation with its principal place of business in Blackwood, New Jersey, is engaged in the business of selling, leasing and servicing microcomputers and computer terminal equipment. All of its equipment is manufactured by other firms. At all times relevant to this action, DASI was the largest independent distributor and servicer of data terminals in the United States Second Consolidated Amended Complaint, ¶ 6.

In its Annual Reports for the fiscal years ending August 31, 1978, 1979 and 1980, audited by Touche Ross & Co. ("Touche"), DASI reported record revenues, net income and earnings per share. The Annual Reports contained optimistic information about DASI. For example, the 1980 Annual Report described the "meteoric rise" of the company. Complaint, ¶ 30. In fiscal year 1980, DASI reported consolidated sales in excess of $37 million, a 32% increase over fiscal year 1979. Complaint, ¶ 29.

DASI's stock responded to the positive news being disseminated about the company. Whereas during the first quarter of 1978 the market price of DASI stock hovered between $3.00 and $5.00 per share, by December 1980, the shares reached a high of approximately $24.00 per share after the 1980 Annual Report was distributed. Complaint, ¶ 32. On February 14, 1979, DASI issued a Registration Statement and Prospectus in connection with an issuance of 710,000 shares of common stock. D.H. Wallach ("Wallach") was the lead underwriter for this stock offering.

But then the fortunes began to turn for DASI. On February 24, 1981, DASI announced that Gerald R. Cicconi ("Cicconi"), Chairman of the Board and Chief Executive Officer, was indicted by a federal grand jury on charges of interstate transportation of fraudulently obtained checks. Complaint, ¶ 33. On June 19, 1981, Touche sent a letter to the SEC advising that their audit reports with respect to DASI's 1978, 1979 and 1980 financial statements should be deemed withdrawn. DASI Disclosure Statement for its Plan of Reorganization, dated April 16, 1984 at page 3.

On June 22, 1981, DASI .announced that Touche had concluded that the company's financial statements for the fiscal years 1978 to 1980 appeared to be materially misstated. On October 3, 1981, Cicconi resigned from the company following his conviction for interstate transportation of stolen checks. On October 29, 1981, the SEC filed a complaint in this court seeking injunctive and other relief against DASI, related companies and several individuals alleging that they violated federal securities laws. A Consent Order was entered by the court on October 29, 1981 which provided, *inter alia,* for the appointment of a Special Agent to investigate the matters set forth in the complaint. On March 15, 1982, the Special Agent submitted his report and recommendations detailing the DASI fraud.

Pursuant to its financial difficulties, DASI on January 21, 1983 filed a voluntary petition in this court for reorganization under Chapter 11 of the Bankruptcy Code. Subsequently, DASI filed a Plan of Reorganization, which was confirmed by this court on August 29, 1984.

The court turns now to the present action. The fifteen named plaintiffs[1] allege in their complaint that defendants DASI, its principal officers and directors (including Cicconi), Mark Serv Co., a company operated by certain DASI officers and directors, Touche, Wallach and others engaged in a scheme spanning three years to defraud plaintiffs. Plaintiffs seek a class for Counts I, III, IV and V of their Complaint defined as:

---

1. Apparently a sixteenth named plaintiff, J.H. Levit, has withdrawn from the case rather than submit to an oral deposition ordered by the court. Touche Opposition Brief at 7 n. 1.

[A]ll those similarly situated who purchased the publicly traded securities of [DASI] during the period between October 31, 1978 and August 24, 1981 inclusive (the "Class Period") and who suffered damage or are entitled to other relief as equity may require, resulting from the acts herein complained of (the "Class"). Excluded from the Class are the defendants herein and all officers and directors of [DASI], members of the immediate family of each of the individual defendants, officers and directors of [DASI], any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

Complaint, ¶ 20(a). Plaintiff Steven Stone seeks a subclass for Count II of the Complaint which alleges that Wallach, the lead underwriter for DASI's February, 1979 stock offering and others issued a false Prospectus and Registration Statement, to be defined as:

[A]ll those similarly situated who purchased the 710,000 shares of [DASI] common stock issued pursuant to [DASI's] Registration Statement and Prospectus effective February 14, 1979 (the "Section 11 Subclass" or the "Subclass") and who suffered damage as a result thereof. Excluded from the Class and the Subclass are the defendants herein and all officers and directors of [DASI], any entity in which any of the defendants has a controlling interest, and legal representatives, heirs, successors and assigns of any of the defendants.

Complaint, ¶ 20(b).

Count I of the Complaint alleges that during the Class Period all defendants except Wallach artificially inflated, or conspired, participated or aided or abetted in the artificial inflation of, the market value of DASI's securities. Complaint, ¶¶ 28, 38. The artificial inflation resulted from material misrepresentations in and omissions from DASI's 1978, 1979 and 1980 Annual Reports, as well as DASI's quarterly reports, and a registration statement and prospectus issued in connection with DASI's February, 1979 public stock offering. Id., ¶ 30. The gravamen of plaintiff's complaint is that, contrary to Generally Accepted Accounting Principles (GAAP), certain transactions between DASI and other entities were reflected as sales on DASI's financial statements whereas they should have been treated as leases. Because of this allegedly incorrect accounting treatment, revenues, earnings and assets were materially overstated and liabilities materially understated. Complaint, ¶ 39(a). Plaintiffs also allege that the financial statements contained information concerning "bogus sales," transactions that never occurred, id., ¶ 39(b), that fraudulent diversions from the company were not reported, id., ¶ 39(d), that DASI failed to disclose that the SEC had been investigating the company since October, 1979, id., ¶ 39(f), and that Touche had been reevaluating its financial statements for some time before the June 22, 1981 disclosure. Id., ¶ 39(g).

Count II alleges that Wallach and certain other defendants violated Section 11 of the 1933 Act in connection with DASI's February, 1979 stock offering as the registration statement and prospectus misrepresented and omitted material facts and presented a misleading picture of DASI's true financial condition. Complaint, ¶¶ 48, 52.

Count IV asserts RICO claims against certain defendants. Complaint, ¶ 63.

Pursuant to the court's pendent jurisdiction, Count III asserts that all defendants violated New Jersey statutory anti-fraud provisions and Count V asserts that defendants were negligent or grossly negligent. Complaint, ¶¶ 57, 60, 72, 74.

## II. Discussion

█ In order to proceed as a class action, plaintiffs must first meet the four requirements of Rule 23(a), Fed.R.Civ.P., which provides that:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of

law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs must then prove that their action falls within one of the three categories listed in Rule 23(b). *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Plaintiffs seek certification under Rule 23(b)(3), which provides that an action may proceed as a class action if:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

 A court may not consider the merits of the plaintiffs' case in determining the certification motion. *Eisen* at 178, 94 S.Ct. at 2153. "[T]he question is not whether the ... plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.,* quoting *Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir. 1971).

The court in *Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 364 (E.D.Pa. 1980), explained the importance of the class action device for securities fraud cases: "The nature of the securities laws is complex and litigation therein concerned expen-

sive. Without the class action device, many actionable wrongs would go uncorrected and persons affected thereby unrecompensed." Accordingly, the Third Circuit has held that "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3rd Cir.1970), quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir.1968).

The court will first discuss the certification with regard to the class for Counts I, III, IV and V (on which the arguments focused on the Section 10(b) class)[2] and then discuss certification with regard to the Section 11 subclass.

## III. Section 10(b) Class Certification

### A. Numerosity

 The factors to be considered for the numerosity requirement are the estimated number of parties in the proposed class, the expediency of joinder and the practicality of multiple lawsuits. *Piel, supra,* 86 F.R.D. at 365. Plaintiffs assert that there are approximately 3,071 record holders of DASI stock who are potential class members and therefore joinder is impractible. That the precise number of class members has not yet been determined does not bar certification under the numerosity rule. *In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa.1976). Defendants do not contest this point and the court holds that the requirement of Rule 23(a)(1) is satisfied.

### B. Common Questions of Law or Fact

 As stated in *Piel,* "This requirement has generally been permissively applied to a large variety of factual circumstances including allegations of conspiracy and securities fraud." *Piel, supra* at 367. *See generally* 7 Wright and Miller, *Federal Practice and Procedure: Civil* § 1763. In the present case, the common questions include whether DASI's financial state-

---

**2.** Touche submitted the briefs opposing the Section 10(b) class certification, and the other Section 10(b) defendants who made appearances joined in the Touche submissions.

ments and Prospectus contain material misrepresentations or omissions. All the plaintiffs here seek to prove these facts. Defendants do not dispute this 23(a)(2) commonality requirement and the court holds that plaintiffs have satisfied it.

## C. Typicality

It is with regard to the typicality requirement, together with the adequacy requirement of 23(a)(4) that the defendants argue most strenuously that the plaintiffs have not met their burden of proof. Defendant Touche argues that plaintiffs' claims are not typical because "the [deposition] testimony of at least thirteen of the fifteen purported class representatives is that they did not rely in any way upon any of [DASI's] financial statements or the prospectus in their purchases of shares." Touche's Brief at 11. Instead, Touche claims that plaintiffs relied on advice from their stockbrokers (Michael Vitiello and Hjalmar S. Sundin), their relatives (Ernest Greenberg, Peter Doniger, Alexandra A. Richardson and Carmen Pecoraro) their friends (Marvin Nott, Raymond Fasteau, Erroll Stoltz) and upon general market trends (John Infante, Irwin Kurlander). *Id.* Touche asserts that only two of the plaintiffs, Pamela Martin and Steven Stone, "testified that they had read *any* of the alleged misstatements at issue herein and Martin testified that she merely 'skimmed' the 1980 Annual Report." *Id.* Finally, Touche argues that Stone is not typical because he has asserted a claim under Section 11 and therefore will not have to prove scienter to recover damages. Accordingly, "assuming he could prevail on his Section 11 claim, and thereby recover his entire loss, Stone clearly will not have the incentive to prove all the elements of a Section 10(b) claim which would be presented by the individual Section 10(b) class members were they initiating individual actions." *Id..* at 21–22.

Plaintiffs respond to Touche by asserting that "[t]he entire issue of reliance (or lack thereof) of any plaintiff ... is simply not a substantive issue which must be proven in this case." Plaintiffs' Reply Brief at 24. The reason for this, according to plaintiffs, is that they are proceeding on a fraud-on-the-market theory, where proof of individual reliance is not necessary. The only necessary elements are that the misrepresentation or omission was material and that it had an impact on the market price.

The court will not .at this time rule on whether the fraud-on-the-market theory is properly applied in this case. The central assumption of the fraud-on-the-market theory is that the market price of a stock reflects all the representations made about that stock. *In re LTV Securities Litigation,* 88 F.R.D. 134, 144 (N.D.Tex.1980). Accordingly, particular misstatements may distort the stock price. Since some investors rely directly on the market to evaluate information rather than making an independent analysis of stocks, any reliance of the market on information is thus reliance by these investors. *Id.* The basic premise for the application of this theory is the existence of a "large, impersonal actively traded market." *In re Ramada Inns Securities Litigation,* 550 F.Supp. 1127, 1131 n. 6 (D.Del.1982). For a thorough review of this theory, *see* Note, "The Fraud-On-The-Market Theory," 95 Harv.L.Rev. 1142 (March 1982). It is for this reason that the court in *LTV Securities Litigation,* which accepted this theory, confined its holding to securities traded in active and substantial markets. 88 F.R.D. at 146.

Turning to the present case, the court finds that it is a question whether the prerequisites for the application for the fraud-on-the-market theory have been met. First, from August 1978, the beginning of the proposed class period, until approximately May, 1979, DASI stock was traded on the over-the-counter market and it was not until May, 1979 that the stock was listed on the American Stock Exchange. Affidavit of David H. Wallach, dated March 21, 1984 at ¶ 27. The trading on the over-the-counter market may not constitute an "active and substantial" market necessary to apply the fraud-on-the-market theory.

Second, while the Second and Ninth Circuits have accepted the fraud-on-the-market theory, *Panzirer v. Wolf,* 663 F.2d 365, 368 (2nd Cir.1981), *vacated on other grounds,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 554 (2nd Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Blackie v. Barrack,* 524 F.2d 891, 906–07 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), and while district courts in this circuit have accepted the general validity of this theory, *Ramada Inns Securities Litigation, supra,* 550 F.Supp. at 1131; *Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168 (E.D.Pa.1979), the Third Circuit Court of Appeals has yet to rule on this theory. While this court believes that this theory is a sensible one, it has not been presented with any testimony concerning its applicability to the present case.

In considering the typicality requirement for this class action motion, however, the court does not need to determine the applicability of the fraud-on-the-market theory. Even if the plaintiffs relied on different pieces of information, and even if they relied on friends, relatives and stockbrokers in purchasing their stock, as defendants argue, these different reliance issues do not render plaintiffs' claims atypical for four reasons.

■ First, a plaintiff's claim is typical of the class if it arises from the "same event or course of conduct which in turn had given rise to the claims of other class members...." [citations omitted]; *Leist v. Tamco Enterprises, Inc.,* 80 Civ. 4439–CLB (S.D.N.Y. March 16, 1982) (unpublished opinion) at 6. Therefore,

The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Id.,* quoting *Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N. Y.1981). *See also* Newberg, *Class Actions,* ¶ 8816, p. 850 (1977) (the typicality requirement "can be met with surprising ease in most cases, because the majority of class action decisions support the view that when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is met.").

■ In the present case, the named plaintiffs have alleged that the defendants injured them by producing false financial statements. As this activity affected the class as well as the named plaintiffs, and as defendants did not take any actions that are unique to these named plaintiffs, the typicality requirement is met.

■ Second, differing types of reliance are present in almost every securities class action. There will always be some individuals who read the financial statements directly, others who read secondary analyses such as Moody's or Value Line, and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class action certification, there could never be a class action of securities purchasers. In the present case, moreover, plaintiffs' modes of reliance—on stockbrokers, friends, and published financial information—is not atypical.

■ Third, even if, as defendants assert, they can prove non-reliance as an affirmative defense, this goes to the merits of the case and cannot be considered by the court on a certification motion. *Eisen, supra,* 417 U.S. at 178, 94 S.Ct. at 2152; *Cohen v. Uniroyal,* 77 F.R.D. 685, 695 (E.D.Pa.1977). The reason for this is that the plaintiffs need not prove their case at this point, but must only meet the requirements of Rule 23. As stated by the court in *Vernon J. Rockler and Co., Inc. v. Graphic Enterprises, Inc.,* 52 F.R.D. 335, 345 (D.Minn.1971), "Reliance is an issue lurking behind every securities fraud claim, and to require that it first be proven, would

effectively negate the concept of a 10b–5 class action."

■ Finally, whether individual reliance will be a necessary element of plaintiffs' claim or whether plaintiffs will be able to travel on the presumptive reliance of the fraud-on-the-market theory is itself a question that is common to and typical of the entire class. *Sharp v. Coopers & Lybrand*, 70 F.R.D. 544, 548 (E.D.Pa.1976).

■ Touche's final argument on the typicality issue is that Stone is not a typical claimant since, should he succeed on his Section 11 claim, he would not have to prove scienter and would not have an incentive to pursue his 10b–5 claim. The court rejects this speculative argument since there may be a greater recovery under 10b–5 and since "it is unrealistic to think that the common lawyer for both classes will forget the fee implications of a greater recovery." *Wolfson v. Solomon*, 54 F.R.D. 584, 589 (S.D.N.Y.1972). *Accord, In re U.S. Financial Securities Litigation*, 64 F.R.D. 443, 455 (S.D.Cal.1974).

The court concludes that plaintiffs have met the typicality requirement of 23(a)(3).

### D. Adequacy of Representation

■ Rule 23(a)(4) mandates that "the representative parties will fairly and adequately protect the interest of the class." Courts in this circuit have consistently applied a two-prong test in assessing the adequacy of representation: (1) whether the named plaintiffs have interests antagonistic to those of the class; and (2) whether the plaintiffs' attorney is qualified to conduct the proposed litigation. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3rd Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Goldsmith v. Hardwicke Co.*, Civ.No. 82–3041 (D.N.J. Aug. 25, 1983) (unpublished opinion) at 6–7; *Piel, supra* at 365. The burden is on the defendants to prove that the representation will be inadequate. *Lewis v. Curtis*, 671 F.2d 779, 788–89 (3rd Cir. 1982).

Defendants do not argue that plaintiffs' counsel is unqualified, and it is clear that plaintiffs' counsel is both experienced and most able. Nor do defendants argue that the named plaintiffs have interests antagonistic to those of the class.

■ Defendants do argue that the plaintiffs have not shown themselves willing and able to finance the litigation. After reviewing the depositions, the court rejects this argument. The named plaintiffs are a generally affluent group who are clearly able to finance this action. If for some reason it later appears the plaintiffs are not able to pay the costs of the litigation and that plaintiffs' counsel will not advance the litigation costs (which is clearly ethical, *Wolgin, supra*, 82 F.R.D. at 175) the court will address the issue at that time.

The court's 23(a)(4) inquiry should properly end at this point. In *Lewis v. Curtis, supra*, a proposed derivative class action suit against the directors of a company, the Third Circuit rejected the argument that a plaintiff's lack of knowledge would prevent him from meeting the adequacy requirement of 23(a)(4). The court in that case found that the plaintiff "displayed a complete ignorance of the facts concerning the transaction that he was challenging." *Id.* at 789. The directors argued that "plaintiff shareholder cannot fairly and adequately represent the interests of the other shareholders unless he has knowledge of material facts in support of his claim." In rejecting this argument, the Third Circuit stated:

> We do not believe, however, that such a requirement makes vigorous representation of the class any more likely. The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel. We believe that the requirements in *Wetzel* are sufficient to insure adequate representation and decline to require anything further.

*Id.*

■ Although the court need not evaluate the named plaintiffs' knowledge of the

facts in this case in determining the certification motion, much of the briefing and oral argument on this motion surrounded the qualifications of the named plaintiffs to pursue the litigation on behalf of the class. Solely to put these issues to rest, the court will address them now.

Touche argues that the named plaintiffs could not adequately represent the class primarily because they lacked familiarity with the facts of the case and totally relied on their counsel. Touche also alleges that the plaintiffs failed to participate adequately in discovery, that the testimony of several witnesses lacked credibility and that one plaintiff was solicited by his attorney. Some examples of the Touche allegations are as follows: Michael Vitiello "unequivocally stated that [he] had no role in the preparation of [his] complaint," Touche's Brief at 27; Irwin Kurlander had not read the complaint "until the very morning of the deposition" *id.*, Peter Doniger "received the complaint *after* it was filed" *id.*, at 28 (emphasis in original) and Pamela Martin "could not even identify the attorney[] representing [her]." *Id.*

In making these and other allegations, Touche is simply grasping at straws in finding some alleged infirmities with the named plaintiffs. It will always be possible to find some aspect of a case in which the plaintiffs are not knowledgeable. When the depositions are read as a whole, however, it is clear that the plaintiffs are knowledgeable. For example, Vitiello graduated from the University of Pennsylvania Law School and is presently a professor at Loyola Law School. He knew that FASB 13, a key standard by which to evaluate the accuracy of DASI's financial statements, is "the accounting rule...that requires an accountant to be able to distinguish between a sale and a lease." Vitiello Dep. at 5, 7–8.

Kurlander, a dentist, reads the *New York Times* and *Wall Street Journal* daily, *Barron's* once a week and *Forbes* once a month. He read reports on DASI in Standard and Poor's and Value Line and followed reports of DASI closely in the newspapers. In February 1981 he read a report that Cicconi had been indicted in Pennsylvania for activities connected with a company other than DASI. He also read articles on Touche's withdrawing as DASI's accountants, on the American Stock Exchange's delisting of DASI stock, on DASI's filing a petition for reorganization under Chapter 11 and on the mechanics of the DASI fraud. Kurlander Dep. at 5, 7, 12–15.

Doniger operates his own company, Data Term, which sells and rents computers. He reads the *Wall Street Journal* and *Computer World* regularly. Contrary to Touche's implied argument, he was familiar with the subject matter of the complaint and discussed it with his attorney before it was filed. Doniger Dep. at 7, 20, 62–63.

Finally, Martin, who worked for an export concern before she had a child, also discussed the subject matter of her complaint with her attorney before it was filed. Martin Dep. at 8, 66–67.

Touche's other attacks on the named plaintiffs—that they failed to participate in discovery, that their testimony was not credible and that one was solicited by his attorney—are devoid of merit and are rejected.

In summary, the court finds these named plaintiffs to be knowledgeable and adequate class representatives, satisfying the 23(a)(4) requirement.

## IV. Type of Class Certification

In addition to satisfying the requirements of Rule 23(a), a proceeding must fit within one of the categories of Rule 23(b) in order to be certified as a class action. Plaintiffs claim that this action falls within the parameters of Rule 23(b)(3); which requires the court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## A. Predominance

The court in *Piel, supra,* discussed the predominance requirement as follows:

> To be sure, individual issues arise in all cases requiring a class action, especially one involving ... a unitary scheme or course of conduct as a common question. But, to allow various secondary issues of the plaintiff's claim to destroy the institution of a class action would render the rule an impotent tool for private enforcement of the federal securities laws.

86 F.R.D. at 373.

■■■ In the present case, the common question is whether the defendants materially misrepresented DASI's financial condition during the class period. All class members are united in their desire to establish the defendants' complicity and liability in the formulation and public dissemination of false and misleading information. The individual questions include the amount of damages each plaintiff will receive.

Touche and the other defendants do not contest that plaintiffs have met this requirement. Inasmuch as defendants could argue that the individualized reliance questions predominate, the court rejects this argument for the reasons discussed above in Section III, C. The court finds that the common questions clearly predominate over any questions individual to the plaintiffs.

## B. Superiority

■■■ Rule 23(b)(3) requires that class action be superior to other methods for the fair and efficient adjudication of the controversy. Plaintiffs alleging injury in the case at bar would be required to bring individual suits in order to seek redress. A class action is, in practical terms, their only means of access to the judicial system. The court finds that individual losses would not warrant the costs of litigation. Moreover, a class action would provide these plaintiffs their "day in court" without overburdening the judicial system with a multiplicity of lawsuits.

The United States Supreme Court made the following comments regarding the efficacy of class action suits, which this court finds particularly relevant to securities litigation:

> The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

*Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 *reh'g denied,* 446 U.S. 947, 100 S.Ct. 2177, 64 L.Ed.2d 804 (1980) (class action suit alleging usurious finance charges made against credit card account holders).

Having examined the circumstances of the case at bar, and the policy and precedent pertaining to predominance of questions common to the class and superiority over other methods of adjudication, the court concludes that the issues of fraudulent misrepresentation and nondisclosure satisfy the requirements of Rule 23(b)(3).

## C. Necessity for an Evidentiary Hearing

Finally, Touche argues that the evidence it has adduced "rebuts plaintiffs' bare allegations ... to the effect that the FRCP 23 requirements have been met herein ...." Thus, should this Court refuse to deny plaintiffs' motion at the present time, an evidentiary hearing would be essential to insure that an adequate record is developed." Touche's Brief at 35–36.

The court rejects this argument. There are no facts which would be developed at an evidentiary hearing that would aid the court in evaluating this class certification motion.

## V. Time of Class Period

The court now turns to the question of appropriate starting and ending dates of the class period. Plaintiffs have requested a class period that extends from October 31, 1978, the approximate date on which DASI issued its 1978 Annual Report, through August 24, 1981, the last trading day for DASI stock before the announcement that DASI had fired Touche as its independent auditor. Plaintiffs' Reply Brief at 2. Touche does not contest the starting date but argues that the class period should end on June 22, 1981, the day on which it was publicly announced that DASI's financial statements appeared to be materially misstated and Touche's audit reports had been withdrawn.

In determining the class period, the court is presented with a somewhat mystifying conundrum: *Eisen* teaches that a court may not look at the merits when determining a class certification motion, yet a court must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints. Take, for example, the scenario of a large multinational corporation which states that its financial reports were false. This information might be broadcast via the national media and trading in the company's stock might be suspended immediately. At some point, trading would be resumed. If plaintiffs/shareholders who sued this company were to request a class period which extended through the resumed trading period, this would clearly be inappropriate. Yet a court would have to evaluate the merits of the action to state that the plaintiffs' claim could not reasonably be extended to the new period.

In determining the termination of the class period, the court believes that the appropriate test is that "liability under the securities acts is terminated when curative information is publicly announced or otherwise effectively disseminated." *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 364 (N.D. Cal. 1982). In essence, that test is a preliminary merits determination whether the facts which underlie the grava-men of the plaintiff's complaint continue to represent a reasonable basis on which an individual purchaser or the market would rely. In making this determination, it would usually not be necessary to hold an evidentiary hearing if there are no material factual disputes. Moreover, doubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period. In *LTV Securities Litigation, supra*, 88 F.R.D. at 147, the court extended the earlier date of the class period because the plaintiff had presented a "sufficiently substantial question." Although the court had reservations that plaintiff would eventually prevail, it said, "Should later discovery reveal this to be in error, the court can redefine the class period." *Id.*

Applying this analytic framework to the above example regarding the multinational corporation, the class period would appropriately end when the multinational announced its reports were false and trading was stopped. That is because the facts underlying the gravamen of a plaintiff's complaint would be the false financial information. After the public announcement, neither an individual purchaser nor the market could reasonably rely on that financial information.

Other courts which have discussed the class period issue have in effect made such a preliminary determination of the merits of plaintiff's action. In *Piel*, the shareholder plaintiff charged that the defendants, the President and Chairman of the Board of National Semiconductor Corporation ("NSC") engaged in a conspiratorial course of conduct to artificially inflate the value of NSC stock so that they could sell their stock at the inflated value. The plaintiff contended that the defendants misrepresented and omitted facts that hindered potential and actual investors from gaining an accurate portrayal of NSC's financial condition and that as a result many investors sustained losses when the market finally reflected the actual value of the stock. 86 F.R.D. at 360–61. The court found that the class period ended on the date when NSC

issued a news release which in that court's view, constituted a retraction of NSC's earlier optimistic financial projections or at least placed the plaintiff on inquiry notice. *Id.* ·at 369 and n. 13. This news release stated that "a substantial near-term decline in profits" was expected. The court believed that this statement, coupled with the Quarterly Financial Statement released 18 days earlier which had cautioned that "exceeding last year's total earnings will be a ·challenge," "sufficiently dissipated" the earlier optimistic projections to warrant the end·of the class period. *Id.* at 363 and n. 12. Accordingly, the *Piel* court made a preliminary merits inquiry and determined that the facts which underlay the gravamen of the complaint—the falsely optimistic financial projections of NSC—could no longer be reasonably relied upon after the public announcement of "a substantial near-term decline in profits."

In *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685 (E.D. Pa.1977) a plaintiff sued defendants Uniroyal and its auditors alleging 10b–5 violations for material misrepresentations and omissions in Uniroyal's financial statements. Then District Judge Higginbotham ruled that the class period extended until the date when "many of the material facts which form the gravamen of this complaint were disclosed to the public for the first time in an article about Uniroyal which appeared in *Forbes Magazine.*" *Id.* at 688, 696. Accordingly, that court had in essence made a preliminary finding that it was no longer reasonable to rely upon the financial statements once the *Forbes* article was published.

In *McFarland v. Memorex, supra,* a securities class action suit, the court terminated the class period on the date that Memorex issued a press release which announced quarterly earnings which the court deemed to be materially disappointing. 96 F.R.D. at 364.

▆▆ In the present case, the facts which form the gravamen of the plaintiffs'

complaint are that DASI's false financial information artificially inflated the price of the stock and when the stock price tumbled to reflect the company's true financial condition, the plaintiffs sustained damages. After the June 22, 1981 announcement that the financial information appeared to be false, it was not reasonable for individuals or the market to rely on that financial information. At a minimum, the facts and legal issues relevant to a claim by purchasers of DASI stock after June 22, 1981 differ markedly from the relevant facts before that date.

The plaintiffs argue that the class period should be extended until August 24, 1981, the last trading day before DASI fired Touche as its auditor. To support this, plaintiffs point to the deposition testimony of Erroll Stoltz, who purchased his stock in July, 1981. Stoltz thought the company might rectify its problems and return to its original value. One reason for this is that DASI employed a "Big Eight" accountant, Touche Ross. Stoltz Dep. at 38–39.[3]

The court rejects plaintiffs' argument. The alleged fraud in this case is that DASI published false financial information, not that Touche remained as its auditor for two months after it had discovered the misstated financial statements.

At oral argument, the plaintiffs suggested that the other defendants might still be liable after June 22, 1981, and that Touche could argue on comparative negligence grounds that it should not be liable after June 22. The court also rejects this argument. The gravamen of the plaintiffs' complaint concerns the false financial information; reliance on that information, after the public disclosure of June 22, 1981 was unreasonable and the court finds that date to be the close of the class period.

### VI. The Section 11 Subclass

▆▆ Plaintiffs move to certify a subclass of individuals who purchased the 710,-

---

**3.** Raymond Fasteau, the other named plaintiff who bought his stock after June 22, 1981, testified that he had heard positive reports about

DASI at a cocktail party in June 1981. Fasteau Dep. at 24–28.

000 shares of DASI common stock pursuant to DASI's Registration Statement and Prospectus effective February 14, 1979. The defendants in this subclass complaint include Touche, Wallach, the lead underwriter, Cicconi and several individuals. Section 11 imposes liability on, *inter alia,* underwriters, individuals who signed the registration statement and accountants who certified any part of a registration statement if the registration statement contained material misrepresentations or omitted material information. 15 U.S.C. § 77k(a). A plaintiff need not prove reliance on the registration statement until after "the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." *Id.*

In the present case, DASI apparently made its 12–month earnings statement generally available during October, 1980. Wallach's Brief at 16–17; Plaintiffs' Supplemental Brief in Opposition to Wallach's Brief at 7.

The court now turns to the specific requirements for the certification of the Section 11 subclass.

## A. Numerosity

■■■ A large number of shareholders purchased their stock following the public offering of February, 1979. Although the exact number of these purchasers is now known, the court holds that the 23(a)(1) numerosity requirement has been satisfied.

## B. Common Questions of Law or Fact

■■■ Common questions for the Section 11 subclass are similar to those for the 10b–5 class. These include the materiality of the misrepresentations and omissions, which for the subclass were included in the Registration Statement. This 23(a)(2) requirement has likewise been met.

## C. Typicality

Plaintiff Steven Stone, the single named plaintiff for the subclass, purchased his DASI stock directly from Wallach on February 14, 1979, the effective date of the Registration Statement. Stone Dep. at 19. He seeks to represent the subclass of individuals who purchased DASI stock from February 14, 1979 until August 24, 1981. Plaintiffs' Brief in Opposition to Wallach Brief at 10. Wallach has argued that Stone is a typical representative only of those individuals who purchased DASI stock directly from the underwriters on or about February 14, 1979. Wallach's Brief at 26. Wallach argues that he is neither a typical representative of individuals who purchased in the "aftermarket"—"second-round" purchasers who bought stock from Stone and others who, like him, purchased directly from the underwriters—nor of those who purchased after the issuance of the 12-month earnings statement.

### i. Aftermarket purchasers

The aftermarket purchasers may best be defined by an illustration. W purchases DASI stock on or about February 14, 1979. After holding the stock for some time, W sells to X, who at some point sells to Y, who in turn sells to Z. Purchasers X, Y, and Z are all purchasers in the aftermarket. Wallach argues that Stone, who was an original purchaser is neither typical of the aftermarket purchasers under Rule 23(a)(3) nor adequately represents them under Rule 23(a)(4) and that individual questions predominate under 23(b)(3). Since these questions are not separate analytically the court will discuss them together here.

Wallach argues that because approximately two million shares of DASI stock were outstanding at the time of the February 14, 1979 public offering, it will be impossible to identify those individuals who purchased DASI stock pursuant to the February 1979 offering. In support of this argument, it submitted an affidavit from David Wallach, President of D.H. Wallach, Inc., who explained that 10 million shares of DASI stock were bought or sold between February 1979 and August 1981. Wallach Aff. at ¶ 12. Much of this stock

was being held beneficially in the street name, where it would be commingled with the DASI stock issued prior to February 1979. *Id.* at ¶ 11. Moreover, in each individual customer's account, "old" (pre-February 1979) DASI stock could be commingled with "new" DASI stock. *Id.* at ¶ 18. Finally, the use of stock depositories renders tracing of particular shares impossible. *Id.* at ¶ ¶ 13, 14. Since a plaintiff must prove that his shares were purchased pursuant to the particular registration statement found to be misleading, *Barnes v. Osofsky,* 373 F.2d 269 (2nd Cir.1967); *Lorber v. Beebe,* 407 F.Supp. 279, 285 (S.D.N.Y.1975), an inability to trace his shares to that statement would mean an inability to prove the elements of his case.

■■■■■ The court rejects Wallach's argument. Although the tracing of stock could conceivably present some problems, that is a merits issue which is not appropriate for consideration on this class certification motion. It would be wholly improper for the court to deny a class certification motion simply because a plaintiff might have difficulties in proving his case. A plaintiff at the certification stage need not prove his case, but must only show that the Rule 23 requirements have been met. Other courts presented with the tracing arguments have resolved the matter similarly. *Kirkwood v. Taylor,* 3–82 Civ. 92 (D.Minn. Nov. 17, 1982) (unpublished opinion) at 7. In *Charal v. Pierce,* CV–81–0042 (E.D.N.Y. Nov. 3, 1981) (unpublished opinion), the court rejected the underwriter's tracing argument since accepting it "would not result in protection of the claims of the class, but rather their summary elimination from the lawsuit without an opportunity to explore the factual and legal issues on which a resolution of the question may ultimately turn." *Id.* at 22. The court also stated that it would leave discovery on the tracing question "to a time when liability has been established and the motivation for exploration of the [tracing] issue is high...." *Id.* at 21–22.

■■■■ The court also holds that the fact that plaintiff Stone was an original pur-

chaser and not an aftermarket purchaser does not render him atypical. Neither does it present a predominance of individual questions over the common questions. The court has been directed to no cases in which Wallach's finely parsed argument was accepted or where it was held that an original purchaser was not an adequate representative of the aftermarket purchasers. The common question of whether the registration statement was materially misleading predominates over any secondary tracing issues that might be encountered. Like the court in *Charal,* this court will also address the tracing issue at a later point, when it is ripe for litigation.

### ii. Purchasers After the Twelve-Month Earnings Statement

Having determined that Stone may appropriately represent aftermarket purchasers, the court next turns to the difficult issue of whether to extend his representation to those absent subclass members who purchased their stock after October, 1980, when the 12-month earnings report was released. This question overlaps with questions regarding the adequacy of Stone's representation and the appropriate time period for the subclass. "Purchasers prior to [the issuance of] a [12-month] statement need not prove reliance on the registration statement, but subsequent purchasers must prove reliance, which makes their case substantially more difficult." *U.S. Financial Securities Litigation, supra,* 64 F.R.D. at 455. The question for the court is whether this "substantially more difficult" issue of reliance prevents Stone's claims from being typical of the entire subclass. The thorough and thoughtful briefs on this subclass certification motion have not uncovered a case in which a court addressed the issue of whether the claims of a named plaintiff who purchased before the 12-month statement were typical of individuals who purchased after the issuance of the 12-month statement.

In *U.S. Financial Securities Litigation,* the court apparently did designate Mr. Bin-

swanger, a pre-12-month purchaser as one of two named plaintiffs to represent a Section 11 class which included post-12-month purchasers. The court did not discuss this issue, saying only that he "appears to be an adequate Section 11 representative because he purchased at the time of the offering." *Id.* at 455. This reasoning does not explain why Binswanger was a typical representative of the post-statement purchasers. The court was more troubled with whether Mr. Fabrikant, who purchased after the release of the 12-month statement, could adequately represent the entire class. The court held that he could since

> First, it is argued by the plaintiffs that such a twelve month earning statement was never published, so that Fabrikant need not prove reliance and thus stands in the same position as all Section 11 claimants. Second, even if such a statement exists, Fabrikant still must prove what is essential to the prestatement Section 11 claimants. He merely has the additional burden of proving actual reliance.

*Id.* That case is different from the case at bar as named plaintiffs existed there who purchased after the 12-month statement and would have an incentive to argue the reliance issue before the court.

In *Weiss v. Tenney*, 47 F.R.D. 283 (S.D. N.Y.1969) a Section 11 class was certified where the class contained both those who purchased before and after the issuance of the 12-month statement. *Id.* at 289–90. Nevertheless, the named plaintiff in that case had purchased shares in both time frames and therefore, like the absent class members, he would personally have to prove reliance in order to recover for his stock purchases that occurred after the 12-month statement. Plaintiff Stone is not in the same position since he purchased only prior to the 12-month statement and need not prove reliance.

▮ After careful consideration, the court finds that Stone's claims are typical not only of those subclass members who purchased before the 12-month statement became generally available, but also of those subclass members who purchased DASI stock after the issuance of the 12-month statement.

First, the common issues among the pre-statement and post-statement purchasers outweigh the individual issues. All purchasers must prove the registration statement was materially misleading. Only then will the court turn to the secondary issue of reliance.

Second, drawing an analogy to Section 10b-5 misrepresentation cases where proof of reliance is still necessary, courts have not rejected class certification because of individual differences in reliance. Reliance issues always vary among plaintiffs and to deny certification on that basis would destroy the utility of class actions in securities fraud actions. This court sees no compelling analytic difference between those cases in which each plaintiff must prove that he or she relied and the present case where some plaintiffs will have to prove reliance and some will not.

Third, courts often hold separate hearings on each plaintiffs' proof of reliance. *See, e.g., Muth v. Dechert, Price & Rhoads,* 70 F.R.D. 602, 607 n.10 (E.D. Pa. 1976). Therefore, even though Stone will not have to prove reliance, his claim is no less typical of the entire subclass than in those situations where a court would bifurcate the trial and adjudicate the reliance issue on a plaintiff-by-plaintiff basis. In the present case, it simply means that if the court bifurcates the trial, it will not have to adjudicate the reliance issue for those who purchased before the 12-month statement. Accordingly, this case presents no more managerial difficulty than a case in which all the plaintiffs must prove reliance.

Finally, the court notes that it may redefine the contours of the class should that become necessary. For example, it might be appropriate at a later time to construct two subclasses, one composed of those who purchased before the 12-month statement was generally made available and the other composed of those who purchased after the 12-month statement.

For the above reasons, the court concludes that Stone's claims are typical even of those individuals who purchased DASI stock after the 12-month statement was issued.

### D. Adequacy of Representation

 Wallach argues that plaintiff Stone is not an adequate representative since he has not complied wholeheartedly with discovery, refusing to answer certain questions and not providing allegedly relevant documents. In particular, Wallach charges that Stone's counsel would not permit any questioning on his views regarding the apportionment of damages among Wallach and the other Section 11 defendants. Section 11(e) states that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable." 15 U.S.C. § 77(k)(e). It is clear that the statute places the burden of proof on the defendant, not the plaintiff regarding the apportionment of damages. Even if plaintiff Stone will eventually be required to answer the questions regarding his views of the apportionment, his failure to do so at the present time cannot defeat certification. The court has reviewed Stone's deposition and concludes that Wallach's discovery allegations simply concern the typical wrangling and cat-and-mouse gamesmanship that occur during discovery. Stone's position is in no way antagonistic to those of other class members and the court does not find any of the discovery disagreements to disqualify Stone from adequately representing the subclass under Rule 23(a)(4).

### E. Predominance of Individual Issues

 In addition to the predominance issues discussed above in VI. C. i and ii

regarding aftermarket and post-12-month statement purchasers, Wallach argues that individual issues predominate regarding the apportionment of liability among defendants. For example, Stone testified that he read numerous different documents before investing in DASI. Other plaintiffs may have read only the Prospectus or may never have read any material regarding DASI. Since the apportionment of liability will be different for every class member, according to Wallach, the individual questions will predominate. Wallach further argues that the apportionment issues go not to the computation of damages but to "the fundamental issue of *causation:* which documents *caused* injury to plaintiffs, and in what respective amounts." Wallach's Brief at 27 (emphasis in original).

The court rejects this argument. If Wallach's argument were accepted, there could never be Section 11 class actions where any documents besides the prospectus and registration statement were alleged to be misleading because invariably individual class members rely to varying degrees on the different documents. In most class actions (such as this one) which include counts under Sections 10(b) and 11, plaintiffs allege a series of misleading documents. *See, e.g., LTV Securities Litigation, supra,* at 139–40. Yet in no case has a court rejected the Section 11 claim because plaintiffs in their 10b–5 claim rely on a number of misleading documents. In all those cases where plaintiffs rely on a series of documents, apportionment of damages might be appropriate. Nevertheless, the prospect of apportionment has not been in other cases and is not in this case a reason to deny certification.

The court finds that the common issues of liability predominate over any individual issues. Furthermore, this subclass meets the superiority requirement as the relatively small amounts of losses involved here would mean that the subclass would be better served by proceeding as a class action, rather than in individual suits. The subclass has met the 23(b)(3) requirement.

## VII. Time of Class Period

 The plaintiff seeks a class period which extends from February 14, 1979 until August 24, 1981. As discussed above in Section V., the court finds that appropriate curative information was disseminated on June 22, 1981. Accordingly, the time period for the Section 11 subclass will be from February 14, 1979 until June 22, 1981.

## VIII. Motions to Strike Briefs

Plaintiffs filed two additional motions (one day before the oral argument) to strike the briefs of Wallach and Touche.

 Regarding Wallach, plaintiffs argued that all briefs were supposed to be submitted on this motion by November 8, 1983. Wallach did not submit its brief until December 30, 1983. Despite the late submission of the brief, the court believes that it raised important new issues and the late submission was not willful. The court will accordingly deny plaintiffs' motion to strike Wallach's brief.

 Plaintiffs also move to strike Touche's Sur-Reply Brief. The Local Rules of the District Courts of New Jersey are designed to facilitate a full presentation of the legal issues on any motion. These local rules provide for the moving party's brief, an opposing brief by the non-moving party and finally a reply brief by the moving party. Touche, the non-moving party then chose to submit a 61-page brief, a so-called "Sur-Reply Memorandum."

The court finds that this brief was completely unnecessary, not contemplated by the rules and moreover exceeded the page limit set by the Local Rules. Touche could have presented any of this information at the oral argument on the motion. Despite Touche's violation of the Local Rules, the court will not strike their Sur-Reply brief as it represents their first violation of the rules. The court is putting all parties on notice, however, that it will not in the future accept any "supplemental" briefs and that it will not accept any briefs exceeding the 30-page limit allotted to the argumentative portion of the briefs. Local Rule 27 B.

## IX. Conclusion

The court is determined that the rights of investors be protected under the securities laws. Public policy demands that aggrieved parties be afforded an opportunity to test the merits of their case, and this court will not deprive the proposed class and subclass a forum for that opportunity. The court agrees with the view that "the effectiveness of the securities laws may depend in large measure on the application of the class action device" which has been expressed by various jurisdictions, including the Third Circuit. *Kahan v. Rosenstiel, supra,* 424 F.2d at 169.

The court has examined the facts of this case as they pertain to the requirements of Fed.R.Civ.P. 23, and has given serious consideration to the arguments supporting and opposing the motion for certification of the class and subclass. The court finds that the claims of the class and subclass satisfy the prerequisites of Rule 23(a) and meet the elements of Rule 23(b)(3). As noted by Justice Thurgood Marshall, "[W]e have repeatedly recognized that securities laws combatting fraud should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 690, 74 L.Ed.2d 548 (1983) quoting *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963).

The court therefore will certify a class of shareholders for Counts I, III, IV, and V of the Complaint to include individuals who purchased DASI stock from October 31, 1978 until June 22, 1981 inclusive and who sustained damage as a result of such purchases.

The court will certify a subclass of shareholders for Count II of the Complaint to include individuals who purchased DASI stock pursuant to the registration statement and prospectus effective February 14, 1979 during the period between February 14, 1979 and June 22, 1981 inclusive and who sustained damage as a result of such purchases.

An order incorporating the foregoing shall be entered.

### ORDER

This matter having come before the court on the 6th day of January, 1984; and

The court having considered the submissions of the parties and oral argument; and

For the reasons stated in the court's opinion filed this date,

It is on this 20th day of September, 1984, hereby **ORDERED** that:

1. Plaintiffs' motion for class action certification is **GRANTED**;

2. For Counts I, III, IV, and V of the Complaint, this class will be defined as all persons who purchased securities of Data Access Systems, Inc. (DASI) from October 31, 1978 until June 22, 1981 inclusive and who sustained damages as a result of such purchases. Excluded from the class are defendants herein, all officers and directors of DASI, members of the immediate family of each of the individual defendants, officers and directors of DASI, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants;

3. For Count II of the Complaint, this subclass will be defined as all persons who purchased the 710,000 shares of DASI common stock issued pursuant to DASI's Registration Statement and Prospectus effective February 14, 1979 during the period between February 14, 1979 and June 22, 1981 inclusive and who sustained damage as a result of such purchases. Excluded from the subclass are the defendants herein and all officers and directors of DASI, members of the immediate family of each of the individual defendants, officers and directors of DASI, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants;

4. Plaintiffs' motion to strike the Opposition Brief of Defendant D.H. Wallach, Inc. is **DENIED**; and

5. Plaintiffs' motion to strike the Sur-Reply Brief of Defendant Touche Ross & Co. is **DENIED**.

No costs.