Robert M. DEUTSCHMAN, Plaintiff,

v.

BENEFICIAL CORPORATION, Finn M.W. Caspersen, and Andrew C. Halvorsen, Defendants.

Civ. A. No. 86–595 MMS.

United States District Court,
D. Delaware.

Sept. 21, 1990.

Robert D. Goldberg, of Biggs & Battaglia, Wilmington, Del. (Richard B. Dannenberg, Richard Bemporad, David C. Harrison, and Jill Rosell, of Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., New York City, of counsel), for plaintiff.

Charles F. Richards, Jr., Kevin G. Abrams, and William P. Bowden, of Richards, Layton & Finger, Wilmington, Del. (Dewey, Ballantine, Bushby, Palmer & Wood, New York City, of counsel), for defendants.

Irving Morris, and Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Del., for proposed intervenor Stephen A. Caffrey.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

This is a securities fraud case arising from the purchase by plaintiff Robert M.

Deutschman of call option contracts on Beneficial Corporation stock during the fall of 1986. In his amended complaint, Deutschman asserts causes of action for violation of federal securities laws and common law negligent misrepresentation and alleges the following against defendant Beneficial Corporation ("Beneficial") and two of its officers, Finn M.W. Caspersen and Andrew C. Halvorsen:

> [T]hat in 1986 and part of 1987 Beneficial's insurance division suffered severe losses which had an adverse impact on Beneficial's financial condition; that [defendants] Caspersen and Halvorsen held stock and stock options in Beneficial which would be adversely affected by a decline in the market price of that stock; that disclosures were made about the losses in Beneficial's insurance division which caused declines in that market price; that in order to prevent further declines Caspersen and Halvorsen, on Beneficial's behalf, issued statements about the problems in the insurance division, which they knew to be false and misleading, to the effect that those problems were behind it and were covered by sufficient reserves; that these misleading statements placed an artificial floor under the market price of Beneficial stock; that purchasers of Beneficial stock and purchasers of call options in Beneficial stock made purchases at prices which were artificially inflated by the market's reliance on defendants' misstatements, and that both purchasers of Beneficial stock and purchasers of Beneficial call options suffered losses as a consequence.

*Deutschman v. Beneficial Corp.*, 841 F.2d 502, 503–04 (3d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). Deutschman has moved for certification of a plaintiff class pursuant to Fed. R.Civ.P. 23(b)(3), consisting of all purchasers (other than defendants and their families) of Beneficial common stock or call option contracts thereon from August 21, 1986 through February 27, 1986 (the "class period"). The class definition proposed by Deutschman is:

> all persons who purchased the common stock of Beneficial during the period August 21, 1986 through February 27, 1987 (the "Class Period"), or who purchased call option contracts thereon during the Class Period, and have or will sustain losses as a result (the "Class"). Excluded from the Class are the defendants herein, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

Plaintiff's Memorandum of Law in Support of Motion for Class Certification at 4–5 (Dkt. 44) (cited hereinafter as "Plaintiff's Memorandum at ___").

Stephen A. Caffrey, who purchased Beneficial common stock during the class period as a participant in Beneficial's 1976 Employees Stock Purchase Plan, has moved to intervene as a plaintiff in this case. Motion to Intervene (Dkt. 41). It appears that Caffrey will seek to be named a class representative in the event class certification is granted. The motion for class certification and the motion to intervene have been fully briefed, and oral argument on both motions has been held. This Opinion resolves both motions. The motion for class certification will be granted although not to the extent desired by plaintiff, and Caffrey will be permitted to intervene. The court will first address the motion for class certification.

### CLASS CERTIFICATION

#### The Rule 10b–5 Claim

The requirements for class certification pursuant to Rule 23(b)(3) are familiar. First, plaintiff must satisfy the prerequisites for a class action set forth in Fed.R. Civ.P. 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the represent-

ative parties will fairly and adequately protect the interests of the class.

The Rule 23(a) requisites are commonly denominated numerosity, commonality, typicality, and adequacy. In addition, plaintiff must satisfy Rule 23(b)(3), which requires that a class action be superior to other methods for fair and efficient adjudication of the case and that questions common to all members of the class predominate over individual issues.

 In order to determine whether to certify the class, the court must examine in greater detail the facts surrounding plaintiff Deutschman's claim. Plaintiff bears the burden of demonstrating that the requisites of Rule 23 are satisfied. Contrary to defendants' argument, however, plaintiff need not show a probability of success on the merits in order to carry his burden of proof regarding class certification. It is axiomatic that the court should not conduct a preliminary hearing on the merits in order to determine whether the suit may be maintained as a class action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *see, e.g., Epstein v. American Reserve Corp.*, 1988 WL 40500 at 2 (N.D.Ill. April 21, 1988) ("It is well-established that the merits of plaintiffs' claims are not in issue on a motion for class certification.") (citation omitted); *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 98 F.R.D. 254, 265 (D.Del.1983) ("The class representative need not establish its case on the merits"); *Piel v. National Semiconductor Corp.*, 86 F.R.D. 357, 368 (E.D.Pa.1980) ("[T]he Court notes that it is improper for it to delve into the merits of the plaintiff's claim when making a class determination. A potential class representative is not required to carry a civil burden of proof in the preliminary stages such as a class determination.") (citation omitted).

In order to determine whether the class should be certified, the court will follow a two-step process. First, it will determine the substantive issues likely to arise at trial. Next, it will examine the type of proof necessary for the various elements and, in particular, which elements may be tried "in common" using generalized evidence that proves or disproves the element on a simultaneous, class-wide basis such that the suit may proceed in a representative manner. *See In re Industrial Gas Anti-trust Lit.*, 100 F.R.D. 280, 288 (N.D. Ill.1983). In the course of its analysis, the court will necessarily examine the factual and legal underpinnings that touch upon the merits of the case. "Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 2458 n. 12, 57 L.Ed.2d 351 (1978) (quoting 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3911, p. 485 n. 45 (1976)). At this stage, plaintiff need only carry his burden of showing that he satisfies the requirements of Rule 23. He need not make a showing that his individual claim is likely to succeed on the merits. *See* 4 H. Newberg, *Class Actions* § 22.16 at 39–40 (2d ed. 1985) and the cases cited therein.

Plaintiff essentially alleges the following.[1] Between January 16—August 15, 1986, Beneficial common stock traded at $45.00—$54.50 per share. For the week ending August 15, 1986, the stock closed at $47.625. For the week ending August 22, 1986, the stock closed at $73.00 and traded at a high of $75.25 and a low of $44.25. From August 22—December 12, 1986, Beneficial common stock traded at $64.625—

---

1. The court recognizes that defendants strenuously contest many of plaintiff's allegations and have submitted substantial evidence in support of their position. It is not the function of the court at this point in the proceedings to make any determination on the merits of plaintiff's assertions, so long as it may be said that they are neither frivolous nor completely without basis. Rather, the court must determine whether plaintiff "is asserting a claim which, *assuming its merit*, will satisfy the requirements of Rule 23." *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 707 (4th Cir.1976) (emphasis in original).

$79.00 per share. From December 16, 1986 —March 3, 1987, the stock traded between $52.25—$65.25.

Plaintiff attributes the dramatic increase in the price of Beneficial stock after the week ending August 15, 1986 to a letter dated August 21, 1986 from Beneficial to its shareholders sent over defendant Caspersen's signature. The letter stated in relevant part:

Today, your Board of Directors authorized your company's management and First Boston to evaluate thoroughly the full range of tactical and strategic alternatives that would enable us to maximize value for you, our shareholders. These alternatives may include, among other things, the sale of Beneficial, merger or other business combination with another entity, the sale of certain assets, repurchase of debt and equity securities and spin-off or sale of subsidiaries. Obviously, at this point, we cannot predict the outcome of the process nor which, if any, of the alternatives will be recommended. We can, however, assure you of the most comprehensive effort to identify and pursue the most meaningful and profitable course for Beneficial and all of its shareholders. In this connection, the Board of Directors has authorized employment contracts for certain officers of the company and a value-created incentive cash bonus plan for certain key executives who are, and will be, instrumental in successfully achieving the strategic alternatives which may be implemented by the company. The plan provides for payments equal to an aggregate of 7 percent of the increase in the price of the company's common stock above $70 per share upon the earlier of the sale or major restructuring of the Company or the end of 1987.

\* \* \* \* \* \*

In order to facilitate whichever strategic course is decided upon, we have determined to anticipate any future adverse loss development in our insurance business by recording a special reserve addition to our property and casualty reinsurance reserves.

While final actuarial, accounting, tax and legal analyses are not yet complete, it appears that a reserve addition of roughly $260 million pretax (approximately $150 million net, after tax benefits) may be booked before year-end to build claim reserves for anticipated ultimate loss emergence and to cover reinsurance recoverables, both related to the run-off of the Company's terminated book of property and casualty reinsurance. This reserve addition is clearly the proper course of action to deal aggressively and forthrightly with this situation and clear the way for the realization of shareholder value. In order to be particularly conservative, the reserve addition would include provisions sufficient to bring reserves of our major property and casualty subsidiary to "high prudent"— the upper end of the range of estimates provided by our outside actuaries. (Tillinghast, a division of Towers, Perrin, Forster and Crosby).

Amended Complaint ¶ 25(a) at 17–18 (Dkt. 7).

Plaintiff alleges that the part of the letter describing the $260 reinsurance reserve addition as "conservative" and "high prudent" was primarily responsible for the increase in the stock price the week ending August 22, 1986. He alleges that subsequent representations by defendants, especially a statement by defendant Caspersen quoted in the Wall Street Journal on September 2, 1986 that Beneficial "got taken to the cleaners [when it entered the reinsurance business].... But it's our view that we've put the problem behind us. This is it. It's done,", Amended Complaint ¶ 28(b) at 20 (Dkt. 7), created a continuing perception that Beneficial had resolved the hemorrhaging caused by losses from its reinsurance business. Plaintiff contends that the statements and perception that Beneficial had taken a conservative approach and put its reinsurance problems behind it were false and misleading when made and artificially inflated the price of Beneficial stock and call options thereon.

Plaintiff alleges that the misperception that Beneficial had resolved its reinsurance

problems and the corresponding artificial inflation of the price of Beneficial common stock continued uncorrected by defendants. On December 16, 1986, the Wall Street Journal published an article questioning the sufficiency of the $260 million reserve addition and stating Beneficial is "expected to have to bolster the $260 million reserve set aside in the third quarter for its troubled reinsurance business ... needed to cover claims that were overlooked in an earlier audit...." Amended Complaint ¶ 40(a) at 29 (Dkt. 7). According to plaintiff, the stock market responded to the Wall Street Journal article, and the market price of Beneficial common stock decreased some twenty percent.

Plaintiff alleges defendants answered the allegations of the article by falsely or recklessly asserting through a spokesperson in an article in the Newark Star Ledger dated December 17, 1986 that Beneficial had "no intention to increase our reserves above what was set aside in the third quarter. Outside actuaries have told us that our reserves are currently at the upper end of the range required. We are not conducting any further audits and we don't believe that any are necessary." According to plaintiff, Beneficial's denial of the assertions made in the December 16, 1986 Wall Street Journal article caused the market price of Beneficial common stock to continue to be polluted until February 27, 1987, when the Wall Street Journal quoted defendant Halvorsen as admitting that Beneficial pumped additional funds into its reserves for its reinsurance unit beyond the $260 million added in the third quarter of 1986.

Plaintiff purchased call option contracts on Beneficial Common stock between August 1986 and February 1987. His complete trading pattern in Beneficial call options was as follows:[2]

### LONG TRANSACTIONS

#### Beneficial January 70 Calls

| TRADE DATE | TRANSACTION | |
| --- | --- | --- |
| 11/25/86 | Purchase 15 BNL Jan. 70 @ $2\frac{3}{4}$ | $ 4,220.55 |
| 11/25/86 | Purchase 25 BNL Jan. 70 @ 3 | 7,659.25 |
| 12/10/86 | Purchase 10 BNL Jan. 70 @ $2\frac{1}{8}$ | 2,183.09 |
| 12/12/86 | Purchase 15 BNL Jan. 70 @ $1\frac{1}{2}$ | 2,348.80 |
| 12/12/86 | Purchase 10 BNL Jan. 70 @ $1\frac{1}{2}$ | 1,553.40 |
| 12/17/86 | Sell 2 BNL Jan. 70 @ $\frac{1}{2}$ | 93.49 |
| 12/18/86 | Sell 53 BNL Jan. 70 @ $\frac{5}{8}$ 3,157.19 | |
| 12/18/86 | Sell 20 BNL Jan. 70 @ $\frac{11}{16}$ | 1,314.88 |
| Gross Realized Loss on January 70 Calls | | $13,399.53 |

#### Beneficial January 60 Calls

| | | |
| --- | --- | --- |
| 12/18/86 | Purchase 10 Jan. 60 · | 3,465.32 |
| 1/7/87 | Sold 10 Jan. 60 | 293.73 |
| Gross Realized Loss on January 60 Calls | | 3,171.59 |

### SHORT TRANSACTIONS

#### Beneficial December 75 Calls

| | | |
| --- | --- | --- |
| 12/11/86 | Sold short 10 BNL Dec. 75 @ $\frac{1}{4}$ | 233.74 |
| 12/11/86 | Sold short 30 BNL Dec. 75 @ $\frac{1}{4}$ | 701.22 |
| 12/12/86 | Sold short 15 BNL Dec. 75 @ $\frac{1}{4}$ | 350.60 |
| 12/12/86 | Sold short 10 BNL Dec. 75 @ $\frac{1}{4}$ | 239.24 |
| 12/12/86 | Sold short 10 BNL Dec. 75 @ $\frac{3}{16}$ | 176.89 |
| Net Gain from short sales of BNL Dec. 75 | | 1,701.69 |

#### Beneficial January 75 Calls

| | | |
| --- | --- | --- |
| 12/10/86 | Sold short 14 BNL Jan. 75 @ 1 | 1,312.26 |
| 12/17/86 | Sold short 39 BNL Jan. 75 @ $\frac{1}{4}$ | 877.46 |
| 12/18/86 | Purchased 53 Jan. 75 @ $\frac{5}{8}$ and closed short sales | 1,788.75 |

**2.** There appears to be some dispute as to which transactions were short transactions and which were part of plaintiff's long position. For purposes of the class certification motion only, the court takes as true plaintiff's characterization of his transactions.

Net Gain from short sales of BNL Jan. 75 $ 401.97
NET REALIZED LOSS ON ALL TRANSACTIONS $14,467.46

Exh. 3, Affidavit of William P. Bowden (Dkt. 78); Exh. A, Plaintiff's Reply Brief in Support of His Motion for Class Certification (Dkt. 83).

Deutschman alleges he suffered losses when the disclosure in the December 16, 1986 Wall Street Journal article that Beneficial's reinsurance problems were not finally resolved caused the call options on Beneficial stock which he purchased to become worthless. In his complaint, plaintiff seeks damages only for losses realized on the November 25, 1986 purchases of 40 Beneficial Jan. 70 call option contracts for a total cost of $11,880 (rounded to the nearest dollar) and the December 12, 1986 purchase of 15 Beneficial Jan. 70 calls at a cost of $2,349 (rounded to the nearest dollar) for total damages of $14,229. *See* Dkt. 1 at ¶ 6. The court notes that the amended complaint (Dkt. 7) implies that Deutschman allowed these calls to expire, thus losing his entire investment. That is not the case. Plaintiff's trading record reveals he sold these calls at a loss and thus recouped a small part of his investment.

■ Plaintiff brings this suit under sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) & 78t(a), and Rule 10b–5 promulgated thereunder. In order to establish civil liability, plaintiff must prove that "the defendant[s] i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's injury." *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989); *see also Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986). He relies on a series of court-created presumptions that have become known as the "fraud on the market" theory to satisfy his burden of showing that all elements may be shown by generalized proof common to all members of the class. Because plaintiff relies on the fraud on the market theory, the court's determination of whether to certify the class involves answering three questions. The court must decide (i) whether a purchaser of call option contracts can rely on the fraud on the market theory; and (ii) if so, whether he can rely on the theory to such a degree that he can represent the interests of a class of purchasers of common stock. If the court answers these two general questions in the affirmative, it must then decide (iii) whether *this* call option purchaser can represent a class of call option and common stock purchasers in *this* litigation.

■ The court begins its analysis with a brief examination of the fraud on the market theory. The fraud on the market theory as it has been developed by the courts is a series of rebuttable presumptions which shifts from plaintiffs to defendants in securities fraud cases the burden of proving plaintiff relied on misrepresentations made by defendant and that such reliance was the cause of plaintiff's loss. The fraud on the market theory finds its origins in the generally held belief, sometimes referred to as the "efficient capital markets hypothesis," that a well-developed and impersonal market, such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly available information about a given security into the market price of that security. *See generally* Gilson & Kraakman, *The Mechanisms of Market Efficiency,* 70 Va.L.Rev. 549 (1984); Note, *Private Causes of Action for Option Investors Under SEC Rule 10b–5: A Policy, Doctrinal, and Economic Analysis,* 100 Harv.L.Rev. 1959, 1977 (1987). If the market price of the security reflects all publicly available information, then purchasers can rely on the integrity of the market price as an accurate reflection of the value of the security. By relying on the market price, purchasers therefore indirectly rely on all publicly disseminated statements and information—including misinformation—about the security. The

fraud on the market theory is really nothing more than a presumption that this is what happens in most instances. The Court of Appeals for the Third Circuit described the theory in the following manner:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. The misstatements may affect the price of the stock, and thus defraud purchasers who rely on the price as an indication of the stock's value. By artificially inflating the price of the stock, the misrepresentations defraud purchasers who rely on the price as an indication of the stock's value.

*Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986) (citation omitted); *accord Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988) ("[W]here materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed") (citing *Peil*).

Stated in its simplest form, the fraud on the market theory is, therefore, a series of three presumptions:

> First, [the] court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as indicative of its value. Third, it presumes the reasonableness of that reliance.

*Zlotnick v. Tie Communications*, 836 F.2d 818, 822 (3d Cir.1988). At trial, the defendant in a case in which a plaintiff has relied on the fraud on the market theory may rebut any or all of these presumptions. *Id.* (the court need not apply any of the fraud on the market presumptions where it would be illogical to do so).

The court now turns to the question of whether a call option purchaser can invoke the fraud on the market theory. The question turns on the relationship between the decision to purchase a call option contract on a particular security and the market price of that security. The Third Circuit Court of Appeals ruled previously in this case that call option purchasers, like shareholders, purchase securities and have standing to bring suit under section 10(b) and Rule 10b–5. *Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir.1988). A call option contract gives its holder the right to purchase a fixed number of shares of a particular security (the "underlying security") at a given price ("striking price") on or before the expiration date of the contract. *Id.* at 504; *see generally* Options Clearing Corp., *The Characteristics and Risks of Standardized Options* (Sept. 1987) (Exh. 6, Bowden Affidavit (Dkt. 78)) (cited hereinafter as "*Characteristics* at ___"); Chicago Bd. Options Exchange, *Understanding Options: A Guide to Puts and Calls* (1977) (Exh. 7, Bowden Affidavit (Dkt. 78)) (cited hereinafter as "*Understanding Options* at ___"). The price which a call option purchaser pays for the option contract is called the "premium." The premium is responsive to the market price of the underlying security. When the market price of the underlying security rises, the premium tends to increase and vice versa.[3]

The purchaser of a call option contract makes a prediction about the direction of the market price of the underlying security and the time period in which the price of the security will change. The purchaser of common stock, however, can hold onto the stock indefinitely and thus predicts only the direction of the market price. Thus, the risks and speculation inherent in purchasing call options differ slightly from those inherent in the purchase of common stock:

> The fact that options become valueless upon expiration means that an option buyer must not only be right about the

---

**3.** The premium is also affected by the time remaining prior to the expiration of the option and the volatility of the market for the underlying security. *Understanding Options* at 10–11.

*direction* of an anticipated price change in the underlying interest, but he must also be right about *when* the price change will occur. If the price of the underlying interest does not change in the anticipated direction before the option expires to an extent sufficient to cover the cost of the option (that is, the initial premium), the investor will lose all or a part of his investment in the option. This contrasts with an investor who purchases the underlying interest directly and may continue to hold his investment notwithstanding its failure to change in price as anticipated in the hope of waiting out an adverse price move and eventually realizing a profit.

*Characteristics and Risks* at 17–18 (emphasis in original).

Defendants argue that call option purchasers are "speculators" who do not rely on the integrity of the market price. Defendants' argument can be stated as follows: (A) call option purchasers profit only if the market price of the underlying security rises above the striking price; (B) thus, call option purchasers buy options only when they expect the market price to rise; (C) because call option purchasers expect the price of the underlying security to rise, they must believe the current market price undervalues the security; and (D) accordingly, it would be illogical to presume that call option purchasers rely on the integrity of the market price.

Defendants rely on *Zlotnick v. TIE Communications,* 836 F.2d 818 (3d Cir.1988). The court in *Zlotnick* refused to presume the short seller plaintiff in that case relied on the integrity of the market price. A short sale involves two transactions. First, the short seller borrows stock from a broker at an agreed upon fee and sells the stock at the prevailing market price (the "short sale"). At some later point, the short seller must return the borrowed stock ("cover"), which he does by acquiring shares on the market. The short seller hopes that the market price will decrease between the time of the short sale and the time he covers; the short seller's profit on the transactions is the difference between the price when he sold short and price when he covered. After the plaintiff sold short in *Zlotnick,* the defendants in that case made several misrepresentations which artificially inflated the market price at which Zlotnick made the covering purchase. The appellate court held that, while the short seller had standing to bring suit for securities fraud, he could not invoke the fraud on the market theory.

The court finds that *Zlotnick* does not control this case because the purchase of a call option contract is more similar to the purchase of stock than it is to a short sale. In some sense, purchasers of the underlying security "speculate" in much the same way as purchasers of call options. Purchasers of common stock realize a gain from the resale of their shares only if the market price of the shares increases. In most instances, purchasers of ordinary common stock expect the shares to hold their value or increase in value over time. Like call option purchasers, stock purchasers "predict" the direction of the market price of the underlying security. The only difference is the time element. It follows that labelling call option purchasers "speculators" does not meaningfully differentiate them from the purchasers of the underlying security with regard to their reliance on the integrity of the market price. *See Deutschman,* 841 F.2d at 507 (characterizing option traders as gamblers does not make them fair game for affirmative misrepresentation while stock traders are not); *Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989) ("There is a fundamental difference between an investor's presumption that the market price will move and the fact that the price was tainted by fraud."). In like vein, while call option purchasers expect the stock price to rise and in that sense believe the market price undervalues the security, it may be presumed nevertheless that they make their decisions based upon the integrity of the market price. Contrary to defendants' position, a purchaser of call options can be presumed to rely on the market price and, consequently, can invoke the fraud on the market presumptions.

Further, unlike short sellers who profit when the market price decreases between the short sale and the covering purchase, both call option purchasers and stock purchasers hope to profit from an *increase* in the market price of the underlying security. In addition, call option contracts are more like shares of stocks than short sales because the largest potential loss from the purchase of a call option or of ordinary common stock is limited to the amount of the initial investment, whereas the potential loss from a short sale is infinite. After a short sale, the short seller must eventually make a covering purchase. Since there is no ceiling on the market price of a particular stock, the short seller's potential loss is limitless if the market price rises.

Finally, as stated above, the premium, or price of the option contract is directly responsive to the market price of the underlying security and to information affecting that price. Consequently, option traders, like purchasers of the underlying security, are susceptible to misrepresentations which distort the market price. *Deutschman,* 841 F.2d at 504. In addition, the market price of the underlying security may affect the premium at which the option holder is able to resell the option contract and the desirability of exercising the option by purchasing the shares at the striking price prior to the expiration date vis-a-vis allowing the option to expire. Because call option purchases are more closely analogous to stock purchases than they are to short sales, the court concludes that call option purchasers can invoke the fraud on the market theory. *See Moskowitz,* 128 F.R.D. at 630–32 (call option purchasers can invoke fraud on the market presumption absent convincing proof that price played no part whatsoever in their decision making); *Tolan v. Computervision Corp.,* 696 F.Supp. 771, 776 (D.Mass.1988) ("Just as the trader in the underlying stock relies on market integrity, so too does the options trader. His market strategy may be different, but his reliance on market integrity is the same.").

The court's conclusion finds further support from the language of the Third Circuit Court of Appeals in this case:

By characterizing option traders as "gamblers" the defendants hope that we will draw the conclusion that they are fair game for affirmative misrepresentation, while stock traders are not. *We are not persuaded that the difference between trading in the two types of securities should lead to different treatment.* Since the price of option contracts is closely dependent upon the price of the underlying stocks, *the degree of risk involved in trading in one over the other is not self-evidently greater.*

*Deutschman,* 841 F.2d at 507 (emphasis added). It is clear the appellate court considers the positions of stock purchasers and option purchasers substantially the same vis-a-vis securities fraud. This court cannot ignore the appellate court's admonition in this very case that the differences between purchasing call options and purchasing ordinary stock should not lead to different treatment. The court holds that call option purchasers may rely on the presumptions of the fraud on the market theory to the same extent as purchasers of ordinary stock. The court now turns to the question of whether this particular class should be certified and whether plaintiff Deutschman should be certified as the class representative.

Rule 23(a) Requirements

1. Numerosity

Fed.R.Civ.P. 23(a)(1) requires that the class be so numerous that joinder of claims is impracticable. There is no "magic number" or other standard formula for determining whether joinder is "impracticable." Rather, the court makes the determination based upon common sense. *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D. Pa.1989). Indicia of the number of potential class members, expediency of joinder and the practicality of multiple lawsuits may be considered. *In re Data Access Systems Sec. Lit.,* 103 F.R.D. 130, 137 (D.N.J.1984); *Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 365 (E.D.Pa. 1980). Plaintiff need not allege the precise number of putative class members in order to establish numerosity. *In re Data Ac-*

*cess Systems Securities Lit.,* 103 F.R.D. at 137; *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 365.

■ In this case, plaintiff alleges that 36,000 shares of Beneficial common stock were purchased by an estimated 2000 investors during the proposed Class Period. Deutschman also alleges that approximately 50,000 call options were purchased by some 90 brokers either for their own accounts or those of their customers. *See* Memo in Support of Class Certification at 12–14. Defendants do not contest numerosity, Transcript of oral argument of June 7, 1990 at 44 (Dkt. 95) (cited hereinafter as "Tr. at ___"). The court finds joinder is impracticable and plaintiff has satisfied the numerosity requirement of Rule 23(a)(1).

### 2. Commonality

■ Plaintiff is required to show there are questions of law or fact common to the class. The commonality requirement has been permissively applied in the context of securities fraud class actions. *See Moskowitz,* 128 F.R.D. at 628; *In re New York City Shoes Sec. Lit.,* [1987–88 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,670 at 98,069, 98,070 (E.D.Pa. Feb. 25, 1988); *In re Data Access Systems Sec. Lit.,* 103 F.R.D. at 137; *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 367. The requirement is satisfied by a showing that "the questions of law or fact linking the class members are substantially related to the resolution of the litigation, even though the individuals are not identically situated." *In re Gulf Oil/Cities Services Tender Offer Lit.,* 112 F.R.D. 383, 386 (S.D.N.Y. 1986).

The common issues in this case concern defendants' course of conduct, i.e., whether defendants (1) caused to be issued certain misrepresentations; (2) with scienter; (3) which misrepresentations were material in that they caused the market price of Beneficial common stock to be artificially inflated. If plaintiff and every class member were to bring suit individually, each would be required to prove this course of conduct. Questions of misrepresentation, materiality, and scienter are "the paradigmatic common question[s] of law or fact in a securities fraud class action." *Moskowitz,* 128 F.R.D. at 629; *see also In re New York City Shoes Sec. Lit., supra,* at 98,070; *In re Endotronics,* [1987–88 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,664 at 98,043, 98,046 (D.Minn. Jan. 28, 1988); *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 368 ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable. . . .") (quoting *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975)). The court finds there are questions of law and fact common to the members of the class as required by Fed.R.Civ.P. 23(a)(2).

### 3. Typicality

Defendants assert Deutschman's claim is not typical of the claims of the proposed class members as required by Rule 23(a)(3). They point to certain instances in Deutschman's trading pattern in Beneficial call option contracts which allegedly demonstrate that Deutschman did not rely on the integrity of the market price of Beneficial common stock when he purchased call options.[4]

---

**4.** For the sake of completeness, the court notes here the specific allegations made by defendants concerning Deutschman's trading pattern and Deutschman's response thereto. Deutschman received a copy of the original complaint in this matter from his attorney on December 18, 1986. Thus, Deutschman was aware of the allegations in the complaint that alleged misrepresentations made by defendants had polluted the market price of Beneficial stock no later than December 18, 1986. On that date, however, Deutschman purchased ten Beneficial January 60 call option contracts and fifty-three Beneficial January 75

call option contracts. Defendants argue that such purchases, made after Deutschman became aware of the allegations in the complaint, are inconsistent with reliance on the integrity of the market price of Beneficial stock. Deutschman responds that the purchase of the January 75's were made to cover a prior short sale, and that the purchase of the January 60's was consistent because of the lower striking price.

Defendants also argue that the fact that Deutschman sold seventy-three January 70's on December 18 and purchased January 75's on the

Essentially, defendants assert that they intend to rebut the fraud on the market presumption of reliance as it applies to Deutschman, thus subjecting him to a unique defense.

▇▇▇ Typicality, like the requirement that the named plaintiff be an adequate class representative, is intended as a safeguard to insure that the named plaintiff's interests are substantially coextensive with the interests of the class. *See, e.g., Shamberg v. Ahlstrom,* 111 F.R.D. 689, 695 (D.N.J.1986). The court's focus should be not upon the merits, but upon "whether the overall scenario is sufficiently similar or 'typical' to ensure that the plaintiff will represent the claims of the class during the course of this litigation." *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 371. The typicality requirement is satisfied, and factual differences will not render a claim atypical, if the named plaintiff's claim arises from the same event or course of conduct and is based upon the same legal theory as the claims of other class members. *Moskowitz,* 128 F.R.D. at 629; *In re Endotronics, supra,* at 98,046; *In re Data Access Sec. Lit.,* 103 F.R.D. at 139. In other words, the focus of the typicality inquiry is not plaintiff's behavior, but defendants'. If defendants' course of conduct gives rise to the claims of all class members, and defendants have not taken any action unique to the named plaintiff, then the representative's claim is typical. *In re IGI Sec. Lit.,* 122 F.R.D. 451, 456 (D.N.J.1988) (citing *In re Data Access Systems Sec. Lit.,* 103 F.R.D. at 139). The court may also consider whether it is predictable that a major focus of the litigation will be an arguable defense unique to the named plaintiff. *E.g., Spicer v. Chicago Bd. Options Exchange,* [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,943 at 95,244, 95,250 (N.D.Ill. Jan. 30, 1990) (quoting *Koos v. First Nat'l Bank,* 496 F.2d 1162, 1164 (7th Cir.1974)).

In this case, Deutschman's claim arises from the same course of conduct as the claims of the class members, namely, the alleged artificial inflation of the market price of Beneficial stock caused by defendants' alleged misrepresentations. Several courts have indicated that a "no-reliance" defense in a securities fraud class action is not the kind of defense unique to the named plaintiff which would render his claim atypical. *See, e.g., In re Endotronics, supra,* at 98,046 ("There is nothing unique about a 'no reliance' defense. Reliance is an essential element of a 10b–5 claim and applies to each class member."). Moreover, these courts have stressed that allowing the possibility of a "no-reliance" defense to prevent certification of a class would eviscerate the usefulness of the class action device in securities fraud cases. *Moskowitz,* 128 F.R.D. at 631 ("[T]he possible availability of a [no-reliance] defense does not foreclose class certification, otherwise the fraud-on-the-market presumption would transmogrify every securities fraud class certification into a full-blown attack on the merits") (citation omitted); *In re Data Access Systems Sec. Lit.,* 103 F.R.D. at 139–140 ("Reliance is an issue lurking behind every securities fraud claim, and to require that it first be proven, would effectively negate the concept of a 10b–5 class action") (quoting *Vernon J. Rockler and Co., Inc. v. Graphic Enterprises, Inc.,* 52 F.R.D. 335, 345 (D.Minn.1971)).

Moreover, the transactions to which defendants point as demonstrating Deutschman's lack of reliance on the integrity of the market price of Beneficial stock were consummated *after* the transactions for which Deutschman seeks damages in the complaint. The fact that Deutschman may not have relied on the integrity of the market price of Beneficial stock on the later transactions does not mean that he cannot claim fraud on the market with regard to the earlier transactions. *See Berman v. Entertainment Marketing, Inc.,* [1989–90 Transfer Binder] Fed.Sec.L.Rep. (CCH)

same day shows no reliance on market price. Deutschman explained that the sale of the January 70's was merely an attempt to mitigate his damages after he became aware that the price

was artificially inflated and, as previously stated, that the purchase was a covering purchase for his prior short sales.

¶ 94,905 at 95,007, 95,009 (E.D.N.Y. Jan. 18, 1990). Since Deutschman's claim arises from the same series of alleged misrepresentations by defendants as the claims of the class members, his claim is typical for purposes of Fed.R.Civ.P. 23(a)(3).

### 4. Adequacy

■ The requirement of Rule 23(a)(4) that the named plaintiff be an "adequate" class representative, like the typicality requirement, is intended to insure that the named plaintiff will present the claims of the class members. *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 370–71. The courts in this circuit have applied a two-prong test to determine whether the named plaintiff has satisfied Rule 23(a)(4). A named plaintiff is an adequate representative if (1) he has no interest antagonistic to the interests of the members of the class; and (2) his attorney is capable of prosecuting the claim with some degree of expertise. *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *In re Data Access Systems Sec. Lit.,* 103 F.R.D. at 140; *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 366.

Defendants do not contest the expertise of plaintiff's counsel. To assure that a representative's interests do not conflict with the interests of the class, the court must be certain that he is a member of the class and possesses the same interest and suffers the same injury as the class members. *See In re Endotronics, supra,* at 98,047. Deutschman satisfies the *Wetzel* test and the requirement of Rule 23(a)(4).[5] The court now turns to the requirements of Fed.R.Civ.P. 23(b)(3).

### Rule 23(b)(3) Requirements

■ In addition to satisfying the prerequisites for a class action set forth in Fed.R.Civ.P. 23(a), plaintiff must also show that common issues in the litigation predominate over individual issues and that the class action is superior to any alternative method of resolving the case in accordance with Fed.R.Civ.P. 23(b)(3). In determining whether plaintiff has made the requisite showings, the court may consider (i) the interest of the class members in individual control over their claims; (ii) any litigation already commenced by members of the class on the class claims; (iii) the desirability of concentrating the litigation in this forum; and (iv) the difficulties likely to be encountered in managing the class action.

### 1. Superiority

■ This circuit has followed a policy of favoring class actions in securities fraud cases:

Class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, "since the effectiveness of the securities laws may depend in large measure on the application of the class action device." *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). We stated further, "[T]he interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Id.* (quoting *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969)).

*Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *see also Moskowitz,* 128 F.R.D. at 628 (citing *Eisenberg* ); *In re New York City Shoes Sec. Lit., supra,* at 98,070 (citing *Eisenberg* ); *Piel v. National Semiconductor Corp.,* 86 F.R.D. at 364. Having found the requirements of Rule 23(a) have been met and assuming the other facets of Rule 23(b)(3) are satisfied, the court holds the class action is superior to alternative methods of resolving this litigation.

### 2. Predominance

■ The court must be satisfied that issues common to all members of the class

---

5. The court will address defendants' allegations concerning Deutschman's credibility as part of its discussion of the predominance requirement of Rule 23(b)(3), *infra.*

will predominate over individual issues. The predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater. *Spicer, supra,* at 95,254; 1 *Newberg on Class Actions* § 4.25 at 318. Rather, the court must determine whether the members of the class seek a remedy to a common legal grievance and whether the common questions of law and fact central to the litigation are common to all class members. *Spicer, supra,* at 95,254. Defendants allege that the individual issues of plaintiff Deutschman's reliance on the integrity of the market price of Beneficial stock and his credibility will prevent the common issues from predominating.

Defendants assert two instances which they intend to use to attack Deutschman's credibility as a witness at trial. The first involves Deutschman's failure to disclose all of his transactions in Beneficial call option contracts in his complaint. As set forth previously, Deutschman made numerous purchases and sales of Beneficial call options from November 1986—January 1987. Of these, the complaint alleges only damages arising from losses realized on the November 25, 1986 purchases of 40 Beneficial Jan. 70 call option contracts for a total cost of $11,880 (rounded to the nearest dollar) and the December 12, 1986 purchase of 15 Beneficial Jan. 70 calls at a cost of $2,349 (rounded to the nearest dollar) for total damages of $14,229. *See* Dkt. 1 at ¶ 6. Defendants characterize the failure of the complaint to mention Deutschman's other trades as an effort to mislead defendants and the court.

Defendants' characterization misses the mark. This is not a case where there was affirmative concealment of certain trades. Deutschman readily produced documents which revealed his other transactions in response to defendants' discovery requests prior to the taking of his deposition. Tr. at 78–81. Moreover, plaintiff was not required to reveal every transaction in the complaint. For instance, plaintiff need not plead in the complaint transactions on which he made a profit, *see Berman, su-* *pra,* at 95,009, although such profits might later be relevant to offset damages. Defendants' reliance on *Zandman v. Joseph,* 102 F.R.D. 924 (N.D.Ind.1984), is misplaced. The plaintiff in that case actively concealed numerous accounts and transactions, of which defendants learned only through their own efforts in conducting discovery and depositions from the plaintiff's brokers. Unlike the situation in *Zandman,* defendants did not have to go on a treasure hunt to uncover Deutschman's transactions in Beneficial call options; defendants' information regarding these transactions came from Deutschman himself during discovery. Defendants' efforts were limited to merely asking for the information. Since there was no active concealment by Deutschman of information concerning his transactions in Beneficial call options, the court finds that the failure to list all transactions in the complaint will not overwhelm the common issues of misrepresentation, scienter, and materiality at trial.

Defendants also plan to attack Deutschman's credibility if he testifies to his reliance on the integrity of the market price or upon the alleged misrepresentations made by defendants when he purchased the call option contracts. Defendants point to Deutschman's attempt to clarify an answer he gave during his deposition. This attempted clarification has already been the subject of one order from this court. During his deposition, Deutschman gave the following response just prior to a recess:

Q. Do you have any belief as to any general factor which led arbitrageurs or other purchasers of Beneficial securities to take a position in the stock during November or December 1986?

A. I don't know what their specific reasons would be for doing it but I assume because they thought the stock was going to go higher.

Q. And why do you think such investors believed Beneficial stock was going higher?

A. Because the company placed itself out there for sale, and it placed the information in the marketplace.

Deposition of Robert M. Deutschman at 122 (Dkt. 66A). Immediately after the recess and apparently after consultation with his attorney, Deutschman stated for the record:

I want to clarify what I was saying in my last answer.

The information in the marketplace is also all their comments about what was going on with their business and particularly with respect to their reinsurance activities and that their problems were behind them.

Deposition of Robert M. Deutschman at 123 (Dkt. 66A). Defendants' counsel proceeded to question Deutschman regarding consultation with his attorney which may have led to the clarification.

The court ordered the clarification and the questioning regarding the clarified answer stricken from the record. The court did allow Deutschman to clarify his answer in accordance with Fed.R.Civ.P. 30(e), and plaintiff so clarified his answer to state "their problems with their reinsurance activities were behind them and that they had adequately provided for whatever losses might be incurred with respect thereto." Defendants' Answering Brief in Opposition to the Motion for Class Certification at 68 (Dkt. 77). Defendants assert they intend to use Deutschman's original answer and the circumstances surrounding the clarified response to impeach Deutschman's anticipated trial testimony that he relied on the integrity of the market price of the stock or upon the alleged misrepresentations in purchasing the call options.

The court finds that the clarification of Deutschman's deposition answer does not raise sufficient concerns about his credibility to prevent certification of the class. Defendants' reliance on *Panzirer v. Wolf,* [1979–80 Transfer binder], Fed.Sec.L.Rep. (CCH) ¶ 97,251 at 96, 763 (S.D.N.Y. Jan. 17, 1980), *aff'd in part,* 663 F.2d 365, 368 (2d Cir.1981), *vacated as moot sub nom., Price–Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), is misplaced. In *Panzirer,* plaintiff's lack of credibility was "abundantly clear." As

summarized by the Second Circuit Court of Appeals, the plaintiff in that case:

gave no less than four versions of her conversation with her broker. At her deposition, she described the conversation as containing no specific information about Allied. Before signing her deposition, she changed her story to say that Michael Blum had read unspecified information to her from his Standard & Poor's tear sheet. In her affidavit explaining her changes in testimony, she alleged that he had told her that Allied had made money in 1978. After defendants introduced an affidavit from the broker that he had never looked at the financial information on Allied in the tear sheet, Zelda Panzirer introduced a final affidavit alleging that he had read financial information to her from the tear sheet.

*Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981), *vacated as moot sub nom., Price–Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). Deutschman's attempts to clarify his deposition answer simply do not amount to the kind of "shockingly drastic" change in testimony found in *Panzirer.* In the first place, Deutschman's original answer is arguably consistent with the theory set forth in his briefing that the takeover speculation was fueled, and in fact made possible, by the alleged misrepresentations. Second, in some 250 pages of testimony, defendants have not pointed to instances other than the failure to disclose transactions in the complaint and the clarified answer as reasons to question Deutschman's credibility.

Defendants apparently intend to use Deutschman's original answer to rebut the fraud on the market presumption either (1) by showing that takeover speculation, and not the alleged misrepresentations, was the cause of the inflated price of Beneficial stock (i.e., that the alleged misrepresentations were not a material factor in the price of the stock), and/or (2) that Deutschman did not rely on the integrity of the market price. As to the materiality of the alleged misrepresentations, the court anticipates that Deutschman's testimony will not be dispositive. The precise effect of the alleged misrepresentations on the market

price of Beneficial stock will likely be determined through the testimony of experts. Deutschman's statements as to his reliance go to defendants' other challenge to predominance—that individual issues of reliance will predominate over the common issues.

If defendants' briefing and oral argument are any indication, they intend to devote considerable focus and evidence to rebutting two fraud on the market presumptions: (i) whether the alleged misstatements were "material," meaning whether they affected the market price; and (ii) whether plaintiff Deutschman relied on the integrity of the market price. Defendants urge that Deutschman's reliance is an individual issue which precludes the issues common to the members of the class from predominating.

As previously stated, in order for a plaintiff to recover in a Rule 10b–5 suit, he must establish misrepresentation, materiality, scienter, reliance, and damages. These elements may be subdivided into two groups: (1) elements going to defendants' course of conduct, which show that defendants are liable ("liability issues"), including misrepresentation, materiality, and scienter; and (2) elements which entitle plaintiff to recover ("recovery issues"), which include reliance and damages. In this case, the liability issues arise from a nucleus of fact common to all members of the class. The recovery issues are individual issues. The court must determine whether defendants' intention to raise a "no reliance" defense to plaintiff Deutschman's claim causes the individual issues to predominate over the liability issues.

In determining whether common questions predominate, the courts have generally focused on the liability issues as opposed to individual questions such as reliance and damages. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Moskowitz*, 128 F.R.D. at 636 (citing *Bogosian*); *In re McDonnell Douglas Corp. Sec. Lit.*, 98 F.R.D. 613, 616 (E.D. Mo.1982) (citing *Bogosian*); *see also* 1 *Newberg on Class Actions* § 4.26 at 326 ("Challenges based on the statute of limita-

tions, fraudulent concealment, releases, causation or *reliance* have usually been rejected and will not bar predominance satisfaction because those issues go to the right of the class member to recover, in contrast to underlying common issues of the defendant's liability.") (emphasis added); cases cited in 1 *Newberg on Class Actions* § 4.26 at 325–26 n. 276. This is because one of the goals of Rule 23(b)(3) is to promote economies of time, effort, and expense and uniformity of decision as to persons similarly situated without sacrificing fairness. Rules Advisory Committee Notes to 1966 Amendments to Fed.R.Civ.P. 23. "It is only where ... predominance exists that economies can be achieved by means of the class action device...." *Id.* When defendants in a securities fraud case have engaged in a course of conduct allegedly in violation of the securities laws, all class members must prove the "liability" elements of misrepresentation, materiality, and scienter in order to recover. Since the facts underlying proof of the liability elements arise form a common nucleus, i.e., defendants' course of conduct, the court may achieve economy by allowing all class members to prove liability in a single proceeding.

As the fraud on the market presumption has gained more acceptance, the courts have largely held that the possibility of a "no reliance" defense against the named plaintiff does not preclude class certification. *See, e.g., Moskowitz*, 128 F.R.D. at 636; *In re Gulf Oil/Cities Service Tender Offer Lit.*, 112 F.R.D. 383, 388–89 (S.D.N.Y.1986); *Piel v. National Semiconductor Corp.*, 86 F.R.D. at 373 ("[T]he speculative possibility that the defendants may have a right to show nonreliance for each class member and that they may wish to exercise this right is not enough to defeat a class action.") (quoting *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 174 (E.D.Pa.1979)).

However, the briefing in this case thus far makes plain that Deutschman's reliance will be one of two major issues at trial, and the court has some concern that the reliance issue could overshadow less controverted common issues. On the other

hand, the materiality issue, which is a common issue, is also likely to be vigorously contested. The court is faced with three alternatives: (1) declining to certify the class, resulting in the necessity for individual suits, assuming they would be economically feasible; (2) certifying the class and dealing with the reliance issue when its prominence in the litigation becomes more clear; or (3) finding an intermediate solution. The court will address each alternative in turn.

Denying class certification in this case would undermine the purpose of Rule 23 and contravene the appellate court's admonition that the court should err in favor of certifying the class in securities fraud cases. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985). The class action device is especially appropriate in securities fraud cases, such as this one, wherein there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant. *Id.*; 4 *Newberg on Class Actions* § 22.01 at 4–5 ("Every circuit that has confronted the issue of class certification in the area of securities litigation has recognized its utility and necessity in a society where geographically dispersed shareholders cannot individually challenge violations by powerful and wealthy corporate defendants because of their small holdings and the unyielding costs of securities litigation.... The SEC and the judiciary have recognized that the class action may be the only meaningful and viable method by which securities investors may remedy their claims.") (footnotes omitted). Reliance must be proved in every securities fraud case. To allow a "no reliance" defense to destroy the institution of a class action would render the class action device useless as a tool for private enforcement of federal securities laws. *In re Data Access Systems Sec. Lit.*, 103 F.R.D. at 142; *Piel v. National Semiconductor Corp.*, 86 F.R.D. at 373. The court is also mindful that there will be a bench trial in this case, thereby reducing the danger of diverting the trier of fact from the common issues by placing greater empha-

sis upon an individual defense against only the named plaintiff.

On the other hand, before certifying a class, the court must assure itself that the interests of the class members will be adequately represented. Defendants have made clear their intention to attack Deutschman's credibility and his reliance on the integrity of the market price of the stock. Although successful rebuttal of the named plaintiff's reliance on the fraud on the market presumption might not necessarily rebut the presumption vis-a-vis the class,[6] it does present some concerns regarding whether the class members' interests will be protected.

In light of the above considerations, the court chooses an intermediate approach. It is clear to the court that the issues which go to defendants' liability—misrepresentation, materiality, and scienter—can and should be tried in a class action. If defendants succeed in their argument that the alleged misrepresentations were not material and did not cause the increase in the market price of Beneficial stock, or if defendants otherwise succeed in defending against the liability issues, there will be no need to address the issue of reliance. Under the appropriate circumstances, Federal Rule of Civil Procedure 23(c)(4)(A) allows the court to certify a class with respect to discreet issues rather than the entire claim. *See, e.g., Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 98 F.R.D. 254 (D.Del.1983). It would be premature, however, to invoke Rule 23(c)(4)(A) at this early stage in the proceedings. The court will tentatively certify the class with respect to the entire claim. In order to simplify and expedite the case, the court will bifurcate the trial *sua sponte* pursuant to Fed.R.Civ.P. 42(b). In the first stage of the proceedings, the liability issues will be tried as a class action. If the plaintiff class succeeds in proving misrepresentation, materiality, and scienter, the court will at that time revisit whether the litigation should continue as a class action or whether the class should be decertified for purposes of litigating the recovery issues.

**6.** A question which the court declines to address at this stage of the proceedings.

*The Negligent Misrepresentation Claims*

Deutschman also seeks certification of a plaintiff class with regard to his claim for negligent misrepresentation. Negligent misrepresentation is a state law claim sounding in tort. The parties have each cited numerous cases in support of their respective positions as to whether a class should be certified on the negligent misrepresentation claim. *Compare, e.g., Worlds of Wonder Sec. Lit.,* [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,004 at 95,628–629 (N.D.Cal.1990); *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1113 (D.R.I.1990); *Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 171–72 (D.Mass.1989); *In re Boardwalk Marketplace Sec. Lit.,* 122 F.R.D. 4, 8 (D.Conn.1988); and *In re United Energy Corp., Etc. Sec. Lit.,* 122 F.R.D. 251 (C.D.Cal.1988) *with, e.g., Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880, 883 (5th Cir.1973); *In re Bexar County Health Facility Dev. Corp. Sec. Lit.,* 125 F.R.D. 625, 636 (E.D.Pa. 1989); *Katz v. Comdisco, Inc.,* 117 F.R.D. 403, 412 (N.D.Ill.1987); *Gavron v. Blinder Robinson & Co.,* 115 F.R.D. 318, 325 (E.D. Pa.1987); and *In re Consumers Power Co. Sec. Lit.,* 105 F.R.D. 583, 605 & 609 (E.D. Mich.1985). Against this backdrop of divided decisional law, the court adds the following comments.

"The concepts underlying section 10b and Rule 10b–5 share an affinity with basic tort concepts." *Wenzel v. Patrick Petroleum Co.,* 745 F.Supp. 211, 214 (D.Del.1990) (citing *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591, 597 (3d Cir.1976)). Generally, the tort of negligent misrepresentation contains the following elements: (1) a false representation of fact made by defendant: (2) made because of defendant's lack of reasonable care in ascertaining the facts; (3) with an intention to induce plaintiff to act or refrain from action in reliance on the representation; (4) justifiable reliance by plaintiff; (5) damages to plaintiff. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on Torts* 728 & 745 (5th ed. 1984). With the exception of scienter, the elements of a claim for negligent misrepresentation appear in general very similar to the elements of a claim under section 10(b) and Rule 10b–5. The same evidence which would establish materiality and misrepresentation in the Rule 10b–5 claim would establish misrepresentation and damages causation in the negligent misrepresentation claim. Unlike the 10b–5 claim, the plaintiff class cannot invoke the fraud on the market theory to establish a presumption of reliance on the alleged misrepresentation by all class members for purposes of the negligent misrepresentation claim. *Peil v. Speiser,* 806 F.2d at 1163 n. 17. As a result, all plaintiffs must show actual reliance. *Id.*

Negligent misrepresentation is a common law claim, the elements of which may differ from jurisdiction to jurisdiction. The court must use Delaware's choice of law rules to determine which jurisdiction's law should be applied to the claim. *Johnston Assoc., Inc. v. Rohm & Haas Co.,* 560 F.Supp. 916, 917 (D.Del.1983). In tort cases, Delaware courts follow the principle of *lex loci delicti,* and apply the law of the place of the injury. *Friday v. Smoot,* 58 Del. 488, 489, 211 A.2d 594, 595 (1965); *Standard Chlorine of Delaware, Inc. v. Dover Steel Co.,* 1988 WL 32044, 1988 Del. Super. LEXIS 100 (March 31, 1988) (C.A. No. 87C–DE–194–1–CV). When the injury alleged is financial only, the law of the state where the economic injury is felt will apply. *J.E. Rhoads & Sons, Inc. v. Ammeraal Inc.,* 1988 WL 32012, 1988 Del.Super. LEXIS 116 at *48 (March 30, 1988) (C.A. No. 83C–NO–98). It follows the law of the place where each plaintiff resides must be applied to each plaintiff's claim. *See Greenwald v. Integrated Energy Inc.,* 102 F.R.D. 65, 71 (S.D.Tex.1984). Deutschman alleges that members of the plaintiff class reside in at least twenty-five jurisdictions. Consequently, the court would have to apply the negligent misrepresentation law of twenty-five jurisdictions to the claim.

Defendants argue that the negligent misrepresentation laws of different states vary significantly, especially in terms of the degree of reliance necessary, and that the individual issues inherent in applying the

laws of at least twenty-five jurisdictions would overwhelm any common issues. This fact weighs against certifying the class, and this court has held on at least one prior occasion that courts will refuse to certify a class where the law of more than one jurisdiction is involved. *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 95 F.R.D. 168, 177 (D.Del. 1982). At the same time, however, two core elements of the tort—misrepresentation and damages causation—must be established for the claims of all class members from the same set of facts, namely, defendants' course of conduct. Whether defendants in fact made misrepresentations and, if so, whether they did so negligently are issues common to all class members. In addition, these two elements involve essentially the same considerations presented by the common issues of the federal securities law claims. This fact weighs in favor of certifying the class. *See In re IGI Sec. Lit.*, 122 F.R.D. at 461.

Deutschman has not yet established with certainty the identities of all class members. Consequently, it is not yet known where the class members reside and which jurisdictions are involved. The parties have provided what is at best minimal evidence of the negligent misrepresentation law of various jurisdictions likely to be applied to the class members' claims. The court will tentatively certify the class for the negligent misrepresentation claims, subject to the same limitations as the 10b–5 class. During the first phase of the trial, the class will be permitted to present evidence as to whether defendants made misrepresentations, and if so, whether the misrepresentations were negligently made. The court notes that the proof necessary to establish scienter in the Rule 10b–5 action may differ from that needed to demonstrate negligence for purposes of the common law claim. Upon completion of the first phase of the trial, the court will consider, if necessary, whether to permit the negligent misrepresentation claim to continue as a class action on the individual

issues or whether to limit certification of the class to the common issues only.

## MOTION TO INTERVENE

On July 31, 1989, Stephen A. Caffrey moved to intervene as a plaintiff in this lawsuit. With the consent of the parties, the court held Caffrey's motion in abeyance pending its decision on class certification. The motion to intervene was fully briefed, and the court heard argument simultaneously with argument on certifying the class. Plaintiff offered no objection to intervention by Caffrey. Defendants oppose intervention.

■■■■■■ Although this lawsuit is a class action, Caffrey must satisfy the requirements of Fed.R.Civ.P. 24 before he can intervene. *See* 4 *Newberg on Class Actions* § 22.64 at 125. Caffrey originally sought only intervention of right pursuant to Rule 24(a). In order to intervene of right, Caffrey must show (1) that his application was timely; (2) that he has an interest relating to the property or transaction which is the subject of the lawsuit; (3) that he is so situated that resolution of the lawsuit would as a practical matter impair or impede his ability to protect his interest; and (4) that his interest is not adequately represented by the existing parties.

■■■■ Caffrey filed the motion to intervene prior to the completion of briefing on the class certification issue and well before the close of discovery on the class certification issue. Defendants have not argued that the motion was untimely, and the court finds that Caffrey's motion was timely.

Caffrey purchased shares of Beneficial common stock during the Class Period as a participant in Beneficial's 1976 Employees Stock Purchase Plan, with the first payroll deduction taking place in October 1986. As a purchaser of Beneficial stock during the Class Period, Caffrey is a member of the plaintiff class in this litigation. It follows he has an interest in the subject of this litigation and that his interest will undoubtedly be affected by its outcome.[7] He thus

---

7. Even if Caffrey elected to opt out of the plaintiff class, his interest would still be affected by

the outcome of the litigation because the court's determination as to the common issues of mis-

satisfies the second and third requirements.

Caffrey's motion founders, however, on the fourth requirement. The proposed intervenor bears the burden of showing that his claims are not represented adequately by the current parties to the litigation. *Hoots v. Commonwealth of Pennsylvania,* 672 F.2d 1133, 1135 (3d Cir. 1982); *Olden v. Hagerstown Cash Register, Inc.,* 619 F.2d 271, 273 (3d Cir.1980). The court has already found that plaintiff Deutschman is an adequate representative of the plaintiff class. Caffrey bases his motion to intervene on the notion that it may happen at some future point in the litigation the court will find that Deutschman can no longer adequately represent Caffrey's interest and the interest of the class. To some degree, Caffrey's argument dovetails with defendants' arguments in opposition to class certification that Deutschman may be unable to show that he relied on defendants' misrepresentations or on the integrity of the market price when he purchased his call option contracts. Caffrey urges the possibility that Deutschman may eventually be deemed an inadequate class representative entitles Caffrey to intervention of right.

The possibility that Deutschman might in the future prove an inadequate class representative is insufficient to satisfy Rule 24(a)'s requirement that proposed intervenor's interests are not adequately represented by the current parties. The interests of Deutschman and Caffrey are substantially identical. As members of the plaintiff class, both Deutschman and Caffrey have an interest in proving that defendants violated the securities laws and in obtaining compensation for defendants' actions. In such cases, the courts in this District apply a three-prong test for determining whether a proposed intervenor's interests are being adequately represented. Inadequacy of representation may be shown by (1) proof of collusion between the representative and the adverse party; (2) a showing that the representative has an in-

terest adverse to the intervenor; and (3) failure of the representative to fulfill his duty. *Steinberg v. Shearson Hayden Stone, Inc.,* 598 F.Supp. 273, 281 (D.Del. 1984); *Pierson v. United States,* 71 F.R.D. 75, 79 (D.Del.1976). Caffrey does not allege collusion or failure on the part of Deutschman. He argues that Deutschman's interest in proving his own reliance may eventually cause him to neglect Caffrey's interests.

Fear of future divergence of interests is insufficient to establish inadequate representation in the absence of a current conflict. For instance, in *McKay v. Heyison,* 614 F.2d 899 (3d Cir.1980), the Third Circuit Court of Appeals held the possibility that the claims of the named plaintiffs would become moot in the future was insufficient to entitle intervenor to intervention of right where the claim of at least one named plaintiff was not moot at the time the motion to intervene was decided. *Id.* at 905–06. Similarly, in *Olden v. Hagerstown Cash Register, Inc.,* 619 F.2d 271 (3d Cir. 1980), the court found that a potential conflict between plaintiff and the insurance carrier's subrogation claim was insufficient to confer intervention of right on the insurance carrier. *Id.* at 275.

In this case, the common issues of misrepresentation, materiality, scienter, and negligence will be tried first. Since both Deutschman and Caffrey have an interest in seeing that these four issues are resolved against defendants, there is not even a potential conflict between them as to the first phase of the litigation. The court has stated it will revisit certification of the class after the common issues are tried. Should the parade of horribles envisioned by Caffrey occur, Caffrey could protect his interests at that time. Caffrey's motion for intervention of right pursuant to Fed.R.Civ.P. 24(a) will be denied.

At oral argument, Caffrey sought leave to amend his motion to include a prayer for permissive intervention under Rule 24(b). The court may in its

representation, materiality, scienter, and negligence might have a collateral estoppel effect on any suit he might subsequently bring on his claims.

discretion permit a party to intervene when there is (1) a timely application; and (2) a showing that the applicant's claim has a question of law or fact in common with the main claim. When deciding whether to grant permissive intervention, the court must consider whether the intervention will unduly delay or prejudice the rights of the original party. Although Caffrey sought to amend the motion to intervene somewhat belatedly, the court finds that the application is timely and will grant leave for Caffrey to seek permissive intervention. The court notes that defendants addressed permissive intervention in their briefing despite the fact that Caffrey's original motion was limited to intervention of right. The court's decision to permit Caffrey to assert a motion for permissive intervention does not prejudice defendants.

As Caffrey is a member of the plaintiff class, there is no question that his claim has a question of law or fact in common with the claims of the class. The case is still in the preliminary stages. Discovery has been limited to the class certification issue. At this early stage, any delay will not be great and will be outweighed by the fact that allowing Caffrey to intervene will benefit the class. Defendants argue that Caffrey's intervention would contribute nothing to the litigation. As things currently stand, however, Deutschman is the lone class representative. The court has certified the class only tentatively, pending resolution of the common issues. Defendants have made quite clear their intention to subject Deutschman's trading record to question on the reliance issue. Intervention by Caffrey is appropriate in order to protect the interests of the class from defenses applying solely to Deutschman, the only class representative.[8] *See McKay v. Heyison*, 614 F.2d at 907 (where claims of named plaintiff are not yet, but may in the future become moot, permitting intervention under Rule 24(b) would not be an abuse of discretion); *In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Lit.*, 467 F.Supp. 227, 258 (W.D.Tex.1979); *First American Corp. v. Foster*, 51 F.R.D. 248, 251 (N.D.Ga.1970); 4 *Newberg on Class Actions* § 22.64 at 128–29 (permissive intervention may be granted to bolster class representation). Finally, insofar as is now known, Caffrey's alleged losses extend beyond December 16, 1986, the last date of Deutschman's alleged damages, *see infra*, which may add an additional dimension to the litigation. *See Commonwealth Oil*, 467 F.Supp. at 258. Caffrey's motion for permissive intervention will be granted.

The court, however, will not grant Caffrey class representative status at this time. Although it is apparent from his briefs and oral argument that Caffrey intends to move for certification as a class representative, he has not yet done so.[9] At the time Caffrey filed the Motion to Intervene and again at oral argument, defendants reserved the right to oppose any motion for class certification by Caffrey. *See* Tr. at 104. Although the court would be willing to entertain such a motion by Caffrey, fairness to the defendants dictates that the court should not *sua sponte* confer class representative status upon Caffrey.

### THE CLASS PERIOD

■ Defendants have also raised some question as to the appropriate closing date of the Class Period. Plaintiff proposes that the Class Period close on February 27, 1987. According to plaintiff, it was on that date the defendants for the first time conceded that the $260 million reserve addition was insufficient and that the reinsurance problem was not resolved. However, it is not clear that this information was not available to the market prior to February 27, 1987. On December 16, 1986, the Wall Street Journal published an article questioning the sufficiency of the $260 million

---

8. The court is not unaware of the fact that Caffrey's participation in the Employee Stock Purchase Plan may well subject him to the "no reliance" defense as well. The court makes no comment at this time as to the merits of a "no reliance" defense as to Caffrey, except to note that this will undoubtedly be a consideration when Caffrey moves for class representative status.

9. The court recognizes that at the time Caffrey filed his Motion to Intervene, the class had not been certified.

reserve addition and stated Beneficial is "expected to have to bolster the $260 million reserve set aside in the third quarter for its troubled reinsurance business ... needed to cover claims that were overlooked in an earlier audit...." According to plaintiff, the stock market responded to the Wall Street Journal article, and the market price of Beneficial common stock decreased some 20%. The fraud on the market presumption upon which plaintiff relies presumes that the market price incorporates *all* available information. Plaintiff argues that defendants' December 17, 1986 denial of the assertions made in the December 16, 1986 Wall Street Journal article caused the market price of Beneficial stock to remain polluted until February 27, 1987.

The appropriate closing date for the class period is the date after which it would no longer be reasonable for an investor to rely on the alleged misrepresentations. *In re Endotronics, supra,* at 98,047. Those stock and option purchasers who purchased Beneficial securities after December 16, 1986 bought at a market price which presumably reflected the information in the December 16, 1986 Wall Street Journal article. Those purchasers are simply not "in the same boat" with those who purchased stock or call options prior to December 16, 1986. *See In re Endotronics, supra,* at 98,047. While Deutschman's assertion that defendants' December 17, 1986 denial of the information in the Wall Street Journal article caused the market price to remain somewhat polluted, the proof necessary to establish the claims of purchasers after December 16, 1986 varies significantly from that of the those who purchased prior to that date. For instance, the materiality of the December 17 denial will almost certainly differ from the materiality of defendants' prior statements. Moreover, the degree of market price pollution after December 16, 1986 may differ from the degree of pollution prior to that date.

Plaintiff Deutschman does not claim any damages arising from transactions which occurred subsequent to December 16, 1986. Plaintiff Caffrey does claim damages from stock purchases made after that date. *See* Complaint in Intervention (Dkt. 41). Because the proof required to establish a claim for damages arising after December 16, 1986 differs significantly from the proof as to transactions which occurred prior to that date, the court will certify two subclasses pursuant to Fed.R.Civ.P. 23(c)(4)(B). The first subclass will be represented by Deutschman and will consist of:

all persons who purchased the common stock of Beneficial during the period August 21, 1986 through December 16, 1986, or who purchased call option contracts thereon during the Class Period, and have or will sustain losses as a result. Excluded from the Class are the defendants herein, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

The court will tentatively certify a second subclass consisting of:

all persons who purchased the common stock of Beneficial during the period December 17, 1986 through February 27, 1987, or who purchased call option contracts thereon during the Class Period, and have or will sustain losses as a result. Excluded from the Class are the defendants herein, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

Although this subclass currently lacks a class representative, it will be certified for the time being based upon the court's assumption that Caffrey will move to be named a class representative in the near future.

CONCLUSION

The court will tentatively certify two subclasses consisting of purchasers of Beneficial stock and call options thereon from August 21, 1986—December 16, 1986 and

**384**

from December 17, 1986—February 27, 1987. Pursuant to Fed.R.Civ.P. 42(b), the court will order a bifurcated trial. In the first phase, the common issues of misrepresentation, materiality, scienter, and negligence will be litigated. At the conclusion to the first phase, the court will, if necessary, revisit whether the remainder of the litigation should go forward as a class action. An order will be entered conforming with this Opinion.

